Sullivan
No. 87-176

THE STATE OF NEW HAMPSHIRE

v.

THOMAS V. DUFIELD

October 31, 1988

*Stephen E. Merrill,* attorney general (*Michael D. Ramsdell,* attorney, on the brief and orally), for the State.

*James E. Duggan,* appellate defender, of Concord, by brief and orally, for the defendant.

SOUTER, J. In appealing his conviction for reckless second degree murder, RSA 630:1-b, I(b), the defendant submits that the Superior Court (*DiClerico,* J.) erred in refusing to recognize a defense of voluntary intoxication rendering the defendant unable to experience a mental state of extreme indifference to the value of human life at the time charged in the indictment. We affirm.

The victim in this case was the defendant's sister, who went to his Claremont apartment late in the evening of February 17, 1984, and drank with him and some of his friends. When the friends left about 1:15 a.m., they observed the victim sleeping in a kitchen chair.

At 7:30 the following evening, one of the guests from the night before returned to the apartment, where she found the victim's dead and naked body face down on a sofa. The buttocks and thighs were fouled with blood and fecal matter, blood had discharged from

the nose and mouth, and a toy Lincoln log protruded from the anus. A bloody flashlight and screwdriver were near the body, with pubic hairs and epithelial cells adhering to their surfaces, and beneath the sofa was a plastic object with wedge-shaped indentations containing feces. Blood and pubic hairs were found on the blades of a pair of scissors lying nearby.

A post mortem examination indicated that these objects had been inserted into the victim's vagina and rectum, and the autopsy revealed that the sterile environment of the abdominal cavity had been penetrated in three places. Analysis of the victim's blood showed an alcohol level of .54 percent by weight.

To the ensuing charge of second degree murder by causing the death "recklessly under circumstances manifesting an extreme indifference to the value of human life," RSA 630:1-b, I(b), the defendant sought to raise two alternative defenses. While he admitted inflicting the injuries described, he presented expert evidence that the victim had already died of alcohol poisoning before he performed the assaultive and mutilating acts. He also claimed that his own voluntary intoxication precluded any finding that he had, at the relevant time, experienced a mental state of extreme indifference to the value of human life. The trial court, however, declined to recognize this second defense. Although evidence of the defendant's intoxication came before the jury, the court refused to receive expert testimony offered to prove the incompatibility of that intoxication with a conscious mental state of extreme indifference. Nor would the court charge the jury that it might consider the intoxication when determining whether the State had proven such a state of mind.

The defendant, of course, realizes that voluntary intoxication would have been no defense if the charge had been simply one of reckless homicide, which would fall under the classification of manslaughter under RSA 630:2, I(b). RSA 626:2, II(c) provides that

"[a] person acts recklessly with respect to a material element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the circumstances known to him, its disregard constitutes a gross deviation from the conduct that a law-abiding person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of

> having voluntarily engaged in intoxication . . . also acts recklessly with respect thereto."

The effect of the final sentence is that a voluntarily intoxicated individual, whose conduct exposes another person to the risk of specified harm that actually occurs, will be penalized if his behavior appears objectively to be a gross deviation from the norm of law-abiding conduct, even though the intoxication blinds him to the risk and thus prevents him from consciously choosing to disregard it.

When the defendant argues that this limitation on the relevance of voluntary intoxication to recklessness has no bearing on the application of the further element of acting "under circumstances manifesting an extreme indifference to the value of human life," *see State v. Howland*, 119 N.H. 413, 416, 402 A.2d 188, 191 (1979), he poses the basic question of how that element functions in raising a reckless homicide charge from manslaughter to murder. If, on the one hand, proof of "circumstances manifesting extreme indifference" required evidence from which a finder of fact would be able to infer a subjective state of indifference, consciously experienced at the time in question, then the defendant might plausibly argue that voluntary intoxication would be relevant to proof of that mental state. On this view, "indifference" would be regarded as an element of an offense comparable to a knowing or purposeful state of mind, which must be shown to have occurred with specific reference to the times and facts to which it relates. *See* RSA 626:2, II(a) and (b).

On the other hand, it could be that the function of proving the existence of "circumstances manifesting extreme indifference" is to establish, not a subjective state of mind, but a degree of divergence from the norm of acceptable behavior even greater than the "gross deviation" from the "law-abiding" norm, by which reckless conduct is defined. On this view, the words in question would describe a way of objectively measuring such a deviation, in which case any voluntary intoxication that might have blinded a defendant to the risks of such extremely deviant behavior would be as irrelevant as it would be to proof of the less culpable deviation required to establish mere recklessness. We believe this latter view is correct, for reasons grounded in the practical consequences of the defendant's position, and the policy underlying the statutory treatment of disregarding risks of harm to others.

The practical consequences would be apparent to any trial judge who had to charge a jury, consistently with the defendant's view of the law, in any case like this one in which there was evidence of the defendant's intoxication. The judge would begin by explaining that a defendant is responsible for the consequences of creating a substantial and unjustifiable risk of death of which he is entirely unaware by reason of voluntary intoxication, but only to the extent that the disregard of that risk by a sober person, aware of the circumstances, would not have exceeded a gross deviation from the norm of law-abiding conduct. The judge would then have to charge that the jury should nevertheless consider evidence of voluntary intoxication in deciding whether the circumstances in which the defendant acted manifested a state of extreme indifference to the value of human life.

It is unlikely, however, that such a charge would ever be effective. A juror who followed its terms would realize that manifesting an extreme indifference to the value of life is simply another, more serious way of creating a substantial risk of death, and such a juror would wonder why responsibility for behavior in the one category should be treated so differently from responsibility for behavior in the other. The distinction would seem irrational, as would the jury instruction itself. The consequence would probably be that the jury would not follow it because it could not understand it. The defendant's dualistic concept of culpability for intoxication in committing a single fatal act suffers, then, from the practical impossibility of applying it in the circumstances of actual criminal trials, and this is a powerful indication that the legislature must have intended the element of "circumstances manifesting an extreme indifference . . ." to function differently from the way the defendant maintains.

The perception we have just ascribed to the puzzled juror suggests a more fruitful approach, however. Whether a defendant's homicidal behavior falls within the category of reckless manslaughter under RSA 630:2, I(b), or the category of second degree murder under RSA 630:1-b, I(b), its culpability arises essentially from the defendant's disregard of the risk of death to another. In each category, the degree of risk for which culpability is assigned is identified by reference to the defendant's deviation from a standard of social behavior. Departing substantially and unjustifiably from the "law-abiding" norm of care for another's life is the benchmark of manslaughter; manifesting extreme indifference to the value of

human life defines the mental state of second degree murder. Each standard performs the same function as a norm from which deviant risk-taking is measured, and actions falling within the categories of lesser and greater culpability form a continuum of behavior.

Thus, the commentary on the Model Penal Code (from which our own Criminal Code is derived, *see* Commission for the Revision of the Criminal Laws, REPORT OF COMMISSION TO RECOMMEND CODIFICATION OF CRIMINAL LAWS 3 (1969)), observes that the question posed by any charge such as the one before us is whether the recklessness rises to the level of extreme indifference to the value of human life. *See* A.L.I., MODEL PENAL CODE AND COMMEN-TARY, Part II, § 210.2, at 21–23 (1980) (footnotes omitted). Consistently with this analysis, a charge under RSA 630:1-b, I(b) of taking life "recklessly under circumstances manifesting an extreme indifference to the value of human life" may be explained to the jury, as the trial judge explained it in this case, by reference to a substantial and unjustifiable risk whose disregard constitutes so gross a deviation from the conduct that a law-abiding person would observe in the circumstances that it manifests extreme indifference to the value of human life.

Because each of the statutory terms, "gross deviation . . ." and "extreme indifference . . . ," performs the same basic function of identifying a particular degree of deviance in creating risk, it is reasonable to infer that the relevance of voluntary intoxication should likewise be the same with respect to culpability for either the lesser or the greater degree of risk so identified. Since, therefore, the statutory definition of reckless conduct, RSA 626:2, II(c), precludes the recognition of voluntary intoxication as an excuse, and thus "postulate[s] a general equivalence between the risks created by the conduct of the drunken actor and the risks created by his conduct in becoming drunk," A.L.I., MODEL PENAL CODE § 2.08, at 9 (Tent. Draft No. 9, 1959), consistent policy demands the same treatment of socially deviant conduct in circumstances manifesting extreme indifference to the value of human life. The law in each case invests an adult defendant with responsibility to know what sort of a person he is, and to stay sober if his intoxication will jeopardize the lives and safety of others. *See People v. Register*, 60 N.Y.2d 270, 279–80, 457 N.E.2d 704, 709, 469 N.Y.S.2d 599, 604 (1983), *cert. denied*, 466 U.S. 953 (1984); *Neitzel v. State*, 655 P.2d 325, 335–36 (Alaska Ct. App. 1982); *cf. Commonwealth v. McDermott*, 393 Mass. 451, 458, 471 N.E.2d 1302,

1306 (1984) (intoxication relevant to proof of murder with intentionality elements of extreme atrocity or cruelty). The trial court's ruling reflects this analysis and is affirmed.

*Affirmed.*

All concurred.