Carroll
No. 89-399

THE STATE OF NEW HAMPSHIRE

v.

TIMOTHY ELDRIDGE

April 23, 1991

*John P. Arnold*, attorney general (*Diane M. Nicolosi*, assistant attorney general, on the brief and orally), for the State.

*James E. Duggan*, chief appellate defender, of Concord, by brief and orally, for the defendant.

BROCK, C.J. The defendant, Timothy Eldridge, was convicted after a jury trial in the Superior Court (*O'Neil*, J.) for the second degree murder of Travis Wiggin. RSA 630:1-b, I(b). He appeals his conviction, arguing (1) that there was insufficient evidence to prove that he acted "recklessly under circumstances manifesting an extreme indifference to the value of human life"; and (2) that statements elicited from him after he asserted his right to counsel should have been excluded from evidence. For reasons that follow, we affirm.

█ █ We first turn to the defendant's sufficiency issue and the facts relevant thereto. When asked to overturn a conviction because of insufficient evidence, we consider the evidence in the light most favorable to the State, *State v. Elbert*, 125 N.H. 1, 12, 480 A.2d 854, 860 (1984), and uphold the jury's verdict unless no rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Sadvari*, 123 N.H. 410, 413, 462 A.2d 102, 103–04 (1983). The defendant has the burden of showing that the evidence was insufficient to prove guilt. *State v. Smith*, 127 N.H. 433, 436, 503 A.2d 774, 776 (1985).

With this standard in mind, we review the evidence presented at trial. On the evening of July 30, 1988, a group of young people, including the twenty-one-year-old defendant and his fifteen-year-old girl friend, Tracy Gurley, gathered at the Chocorua Village Store after an aborted trip to the car races at Epping. Some members of the group, including the defendant, had been consuming alcohol throughout the evening. While at the store, the defendant asked his stepsister to telephone fifteen-year-old Travis Wiggin.

The defendant and Travis were on bad terms because the defendant's girl friend, Tracy, had been Travis' girl friend until recently. However, even after Tracy began to date the defendant, Travis continued to visit her by climbing into her bedroom window late at night. Apparently, the defendant wanted Travis to stay away from her and had, on three different occasions, threatened to kill Travis. The last

of these threats occurred on July 8, when the defendant told Travis' brother Gary to tell Travis "to come through the window because I sleep with a .357 and I will kill him."

Pursuant to the defendant's request, his stepsister telephoned Travis, and they agreed to meet at a local gas station near Travis' grandmother's home. The defendant's group arrived at the station first, whereupon the defendant asked two of his friends to hide and wait for Travis in order to prevent Travis from running away. The defendant hid behind the station and waited for Travis.

Before Travis left his house, his brother Gary expressed some apprehension to Travis about the meeting. Although Travis assured his brother that he would be cautious, Gary, nevertheless, waited about five minutes and then decided to follow Travis to the station. He drove to the station but initially did not see his brother. When Travis did appear, he was intercepted by the defendant, temporarily placed into a headlock, and escorted to the defendant's car. At trial there was repeated testimony that during this time Travis was holding his hands up in the air and appeared to be frightened.

The defendant and Travis got into the front seat of the car and two of the girls from the group got into the back seat. They decided to go to Chocorua Lake, so the group, including Gary, proceeded in that direction. En route to the lake, the defendant pulled out a .357 magnum revolver, pointed it at Travis, cocked it and continued to drive with his other hand. Despite Travis' pleas not to be hurt, the defendant continued to point the cocked revolver at Travis. When they arrived at the lake, the defendant told Travis to get out of the car, but, before Travis could do so, the defendant fired the gun, fatally wounding Travis.

After the shooting, the defendant was distraught and repeatedly told his friends that the shooting was an accident. Nevertheless, after initially throwing the gun out of the car window, the defendant decided to throw the revolver into the nearby lake. He then later asked members of the group to retrieve the gun and to fill it with empty shells. He also unsuccessfully tried to get money from his friends in order to leave the State.

On appeal, the defendant argues that, although reckless, his conduct does not reach the level of conduct exhibiting an extreme indifference to the value of human life. He contends in his brief that our holding in State v. Dufield, 131 N.H. 35, 37, 549 A.2d 1205, 1206–07 (1988) requires the State to prove that his conduct was more serious than mere recklessness and must show "a degree of divergence from the norm of acceptable behavior even greater than the 'gross devia-

tion' from the 'law-abiding' norm, by which reckless conduct is defined." He contends that the facts of his situation are analogous to the facts in the case of *People v. Magliato*, 110 A.D.2d 266, 494 N.Y.S.2d 307 (1985), *appeal granted*, 67 N.Y.2d 653, 499 N.Y.S.2d 1050, 490 N.E.2d 566, *appeal dismissed*, 67 N.Y.2d 829, 501 N.Y.S.2d 658, 492 N.E.2d 786, *aff'd*, 68 N.Y.2d 24, 505 N.Y.S.2d 836, 496 N.E.2d 856 (1986), where a second degree murder conviction was reduced to manslaughter, since firing of a gun at the victim at a distance of forty-five feet was found not to support the verdict.

We are not persuaded by the defendant's argument. In our view, the defendant's conduct in cocking a loaded revolver and holding it point-blank against the victim, particularly after consuming alcoholic beverages, exhibits such a blatant disregard of an unjustifiable risk as to manifest extreme indifference to the value of human life. This conclusion is further supported by evidence revealing that the defendant was experienced in the safe use and operation of firearms. The defendant's reliance on the cases of *People v. Magliato*, 110 A.D.2d 266, 494 N.Y.S.2d 307, and *People v. France*, 57 A.D.2d 432, 394 N.Y.S.2d 891 (1977), is misplaced, as the facts of those cases are not analogous to the facts of the case before us.

■ Considering the evidence in the light most favorable to the State, we conclude that a rational juror could have found, beyond a reasonable doubt, that the defendant's conduct exhibited circumstances manifesting an extreme indifference to the value of human life. Thus, the record supports the conviction.

We next address the defendant's claim that his State and federal constitutional rights were violated after he asserted his right to counsel, under *State v. Tapply*, 124 N.H. 318, 470 A.2d 900 (1983), and that any statements made after he requested counsel should have been excluded from evidence at his trial. The circumstances surrounding this alleged violation are as follows.

After the shooting, that same night at approximately 1:30 a.m., the defendant went to the local State Police station to turn himself in. There he was met by Trooper McElwee and told the trooper, "[M]y name is Timothy Eldridge. I shot Travis Wiggin." Trooper McElwee called his supervisor, Sergeant Schwatka.

Sergeant Schwatka arrived at the station and asked the defendant to accompany him to the detectives' room. The defendant requested that his father be with him. The defendant's father, James Eldridge, had been employed with the State Police as a dispatcher with Troop E for approximately twelve years. When James Eldridge arrived,

the defendant told him that he shot Wiggin and made reference to the use of hollow point bullets.

Sergeant Schwatka then advised the defendant of his *Miranda* rights, utilizing a standard form, and the defendant noted his understanding of each right. The defendant then read aloud the rights, voiced his understanding, and signed the form. To ensure that the defendant's understanding was not impaired by alcohol, Sergeant Schwatka also administered two sobriety tests on the defendant, both of which he passed.

In the presence of his father, the defendant described to Sergeant Schwatka the events surrounding the shooting. He told the trooper that, although he disliked Travis, he did not mean to shoot him. The defendant also stated that he did not know that the gun was loaded. He did admit, however, to pulling the gun out while en route to the lake and to throwing the gun into the lake after the shooting.

Sergeant Schwatka stopped the interview when the defendant asked if he was going to need a lawyer and stated that he could not afford one. Sergeant Schwatka advised the defendant not to say anything further, left the room, and instructed Trooper West to enter the room and sit with the defendant. The defendant then initiated conversation with his father and Trooper West. In response to the defendant's questions about possible charges he faced, Trooper West discussed the elements of first degree, second degree and capital murder.

Later that morning, Sergeant Schwatka learned that Travis Wiggin had died and called Trooper West out of the detectives' room to inform him. Trooper West then reentered the room, and Sergeant Schwatka overheard the defendant ask about Wiggin's condition. At that point, Sergeant Schwatka stepped into the room and advised the defendant of Wiggin's death and then left the room. In response, the defendant stated that he didn't mean to shoot Wiggin, that he "murdered" him, that it would appear as though he killed him because he was angry at him, and that he was not that angry at him. The defendant also made reference to his future in prison by asking, "How am I going to handle Concord?"

The defendant then offered to show Trooper West where the gun was located. In response, Trooper West asked the defendant whether the gun was still loaded. The defendant answered by stating that at the time of the shooting he did not know that the gun was loaded and that he never fired it after putting the last three rounds into it. Trooper West reminded the defendant that he did not have to speak, to which the defendant responded that he wanted to talk. At approx-

imately 3:30 a.m., the defendant was given a breathalizer test, which indicated a .12 percent blood alcohol level.

Prior to trial, the defendant moved to suppress the statements he made to police after he was given his *Miranda* rights and any physical evidence obtained as a result of those statements. In support of his motion, the defendant argued that he neither understood nor effectively waived his rights due to his intoxication. The defendant contended that he had asserted his right to counsel and that the police improperly engaged in the functional equivalent of interrogation. The defendant also asserted that police interrogation regarding the gun was in violation of his State and federal constitutional right to counsel.

The trial court denied the defendant's motion to suppress, ruling that the defendant fully understood his rights, and made a knowing, intelligent and voluntary waiver. The court also concluded that the defendant did not assert his right to counsel and that the police's informing the defendant that the victim had died was not a functional equivalent of interrogation by the police.

On appeal, the defendant challenges the trial court's failure to suppress his statements made after he allegedly invoked his right to counsel, and reasserts the grounds he offered at the trial court in support thereof. Assuming that we were to accept the defendant's position that he invoked his right to counsel, that the police improperly interrogated him, and that therefore his post-inquiry statements were erroneously admitted, we nevertheless would decide that the introduction of the statements was harmless error.

 Erroneous admission of evidence is harmless if it is determined, beyond a reasonable doubt, that the verdict was not affected. *State v. Sampson*, 132 N.H. 343, 348, 565 A.2d 1040, 1043 (1989) (citing *State v. Ruelke*, 116 N.H. 692, 694, 366 A.2d 497, 498 (1976)). In evaluating whether introduction of a defendant's statements, after he has inquired about a lawyer, affected the verdict, we consider the other evidence presented at trial. *See State v. Sampson supra* (citing *State v. Dellorfano*, 128 N.H. 628, 637, 517 A.2d 1163, 1169 (1986)).

The defendant argues that admission of his post-inquiry statements containing declarations that he "murdered" Wiggin and his reference to going to prison (*i.e.*, "Concord"), were harmful to his case by undercutting his defense that the killing was not murder, but rather was accidental. Defendant also contends that his admission to putting the three rounds into the gun contradicted his earlier statement to police that he did not realize that the gun was loaded, and

that this contradiction diminishes the credibility of his claim that the shooting was accidental.

The record reveals that the defendant's statements to police, prior to inquiring about a lawyer, and to other witnesses include (1) several admissions to the shooting, (2) his statement about pulling out the gun while in the car, (3) his reference about two bullets being left in the gun, (4) his statement that he was target shooting with the gun a few days prior to the incident and left the gun in his car, and (5) his statement about throwing the gun into the lake. The defendant's declaration that he "murdered" Wiggin and his reference to prison do not further incriminate him in light of his earlier admission to the shooting. His use of the term "murdered" in this context does not serve as an admission to an "intentional" killing. Rather, this term serves as a duplicative admission to the shooting. Defendant's statement that he never fired the gun after putting the last three rounds into it also does not further incriminate him, since there was additional witness testimony that the defendant referred to there being two bullets left in the gun. This reference would serve to infer defendant's knowledge that the gun was loaded.

█ In light of all the other evidence at trial, introduction of the defendant's statements after inquiring about a lawyer did not further incriminate him by exposing the jury to previously undisclosed information. *See State v. Sampson*, 132 N.H. at 348, 565 A.2d at 1043. The incriminating nature and abundance of the other evidence at trial leads us to conclude, beyond a reasonable doubt, and we so hold, that the introduction of the defendant's post-inquiry statements did not affect the verdict, and was therefore harmless error.

*Affirmed.*

All concurred.