Hillsborough
No. 90-508

THE STATE OF NEW HAMPSHIRE

v.

MARC BURRELL

July 10, 1992

*John P. Arnold,* attorney general (*Diane M. Nicolosi,* assistant attorney general, on the brief), by brief for the State.

*James E. Duggan*, chief appellate defender, of Concord, by brief for the defendant.

THAYER, J.    The defendant, Marc Burrell, was convicted of manslaughter, RSA 630:2, I(b), after a jury trial in the Superior Court (*Dalianis*, J.). The defendant appeals, arguing that the trial court committed an error in its jury instruction concerning the requirement under RSA 626:1, I, that conduct creating criminal liability must include a voluntary act. We affirm.

On January 6, 1989, Douglas Saari and Joey Baglione made plans to have a few drinks at Baglione's house. Before going there, Saari, a minor, stopped at the defendant's house and asked the defendant to purchase beer. The defendant agreed and decided to accompany Saari to Baglione's.

When they arrived, Baglione answered the door holding a .357 revolver. Inside the house was an AR-15 rifle, possibly a shotgun, a .44 revolver, and a .38 snub-nose revolver. The .357 and .44 revolvers were loaded. During the afternoon the three drank beer and watched an X-rated movie. Baglione and the defendant played a form of Russian roulette with the .357 revolver. One bullet was placed in the chamber, the chamber was spun, one player placed the gun to his head with his finger on the trigger, and then the gun was examined to see whether the bullet would have been discharged if the trigger had been pulled. At some point in the afternoon, all three went out on Baglione's back porch and fired one or two rounds with the .44 revolver.

At trial, Saari testified that while Baglione was out of the room, Saari told the defendant that he was going to steal the .38 and placed it in the lining of his leather jacket. The defendant agreed to go along with Saari, and stated that he was going to steal the AR-15, the .44, and the .357. When Baglione returned, the defendant announced his intention to steal the weapons. Baglione said, "You're not going to steal those guns, so I'll stop you." Baglione ran out of the room, and returned with a shotgun. By then, the defendant had put down the AR-15, but kept the .44 in his belt and the .357 in his hand. Saari testified that Baglione "came running out of the basement . . . and told [the defendant], . . . 'You're not going to steal those guns because I'll blow your f_____ head off.'" Saari added that Baglione was not "serious . . . [and] he pumped the shotgun more than once, so I know it wasn't loaded." Saari then "looked at [the defendant] to see what his response was. And before I had time to do anything, he had shot in [Baglione's] direction" and hit him. The defendant dropped the

gun, tried to call an ambulance, but panicked and went outside. At that time, Baglione's brother-in-law, Greg Eastman, arrived and called the ambulance. After the ambulance arrived, Eastman, Saari and the defendant went to the hospital.

At trial, the defendant testified that the fatal shooting did not occur when Baglione threatened him, but later in the afternoon while he and Baglione were preparing to take some of the guns back to a closet in Baglione's father's bedroom. Before storing the guns, Baglione told the defendant that his father always kept the .357 loaded. The defendant testified that, after loading the .357 revolver, he was seated on the forward edge of the loveseat with his feet outstretched. Baglione passed in front of him from right to left. While Baglione was to his left, he sighted the gun on the hearth and put his finger on the trigger. He heard a noise and saw Baglione move from left to right in front of him. Thinking that they were going to collide, he jerked back and the gun went off. The defendant admitted on cross-examination that because of a lazy left eye, a problem he was aware of on the day of the shooting, he had great difficulty seeing anything to his left.

In New Hampshire, "[a] person is not guilty of an offense unless his criminal liability is based on conduct that includes a voluntary act or the voluntary omission to perform an act of which he is physically capable." RSA 626:1, I. The defendant does not dispute either the statutory requirement or the fundamental principle that criminal liability must be predicated upon conduct that includes a voluntary act. *See* C. TORCIA, WHARTON'S CRIMINAL LAW § 25, at 119 (1978) (minimal requirement of criminal liability is that person engage in conduct that includes a voluntary act); MODEL PENAL CODE § 2.01(1) (Proposed Official Draft 1962) ("A person is not guilty of an offense unless his liability is based on conduct that includes a voluntary act . . . ."). The defendant, however, contends that the court erred in failing to instruct the jury that it must find that the defendant's act of pulling the trigger was voluntary.

■■ "A trial judge's primary duty in charging the jury is to clarify the issues of the case, and to assist the jury in understanding the questions to be resolved." *State v. Bird*, 122 N.H. 10, 15, 440 A.2d 441, 443 (1982). As long as the trial court adequately instructs the jury on the applicable law, the court is under no obligation to include the specific language requested by a party. *State v. Sands*, 123 N.H. 570, 613, 467 A.2d 202, 230 (1983). In reviewing disputed jury instructions, we will consider them in their entirety, and reversal is not

warranted unless the trial court's instructions, as a whole, fail to adequately present and explain the issues of law in the case. *State v. Saucier*, 128 N.H. 291, 299, 512 A.2d 1120, 1126 (1986).

The trial court gave the jury the following instruction on the voluntary act requirement:

> "A person is not guilty of an offense unless his criminal liability is based upon conduct that includes a voluntary act. A voluntary act is defined as conduct which is performed consciously as a result of effort or determination. To find the defendant guilty of an offense, any offense, you must find that the criminal liability is based upon conduct that includes a voluntary act. And although a voluntary act is an absolute requirement for criminal liability, you do not have to find that every single act in the circumstances presented to you was voluntary. It is sufficient to satisfy the requirement of a voluntary act if you find that the defendant's conduct causing the death of Joseph Baglione, Jr. included a voluntary act."

The defendant requested the following instruction:

> "A person is not guilty of an offense unless his criminal liability is based on conduct that includes a voluntary act. If you find the Defendant's act of pulling the trigger of the handgun in this case not to have been a voluntary act, then you must find the Defendant not guilty."

Initially, we note that the first sentence of the defendant's requested instruction is identical to the first sentence of the instruction that was given and mirrors the pertinent portion of RSA 626:1, I. Thus, we turn our attention to the defendant's request that the court instruct the jury that the defendant's act of pulling the trigger must have been a voluntary act.

The defendant essentially asks this court to require the State to prove that the defendant's *last* act was voluntary in order to establish criminal liability. There is no support for this proposition in either the statute or in our case law. The statute only requires that the defendant's conduct that gives rise to criminal liability include a voluntary act. RSA 626:1, I; *cf.* MODEL PENAL CODE § 2.01 comment 1 (Code "requires that criminal liability be based on conduct and that the conduct that gives rise to liability include a voluntary act").

■ Recently, in *State v. Eldridge*, 134 N.H. 118, 588 A.2d 1222 (1991), we held that a "defendant's conduct in cocking a loaded re-

volver and holding it point-blank against the victim, particularly after consuming alcoholic beverages, exhibits such a blatant disregard of an unjustifiable risk as to manifest extreme indifference to the value of human life," *id.* at 121, 588 A.2d at 1223–24, and was sufficient to support his conviction for second degree murder, *id.* For our present purposes, it is significant that the conduct that we relied on as sufficient to manifest extreme indifference to the value of human life did not include Eldridge's last act of pulling the trigger. Indeed, because there is no requirement that the conduct upon which the defendant's criminal liability is based include the last act prior to the moment of harm, it follows that there is no requirement that the last act be voluntary. *See People v. Grant*, 46 Ill. App. 3d 125, 131, 360 N.E.2d 809, 815 (1977) (although a voluntary act is absolutely necessary for criminal liability, "there is no requirement that every act preceding the actual commission of the offense be voluntary"), *rev'd on other grounds*, 71 Ill. 2d 551, 377 N.E.2d 4 (1978); *see also* W. LaFave & A. Scott, Handbook on Criminal Law 181 (1972) (criminal liability requires voluntary act but not every act up to moment of harm need be voluntary). We hold that the trial court's refusal to instruct the jury that the defendant's act of pulling the trigger must have been a voluntary act was not error.

*Affirmed.*

All concurred.