1997 ME 100

**STATE of Maine**

v.

**Travis THERRIEN.**

Supreme Judicial Court of Maine.

Argued Dec. 3, 1996.
Decided May 14, 1997.

Andrew Ketterer, Attorney General, Nancy Torresen, Asst. Atty. Gen. (orally), William R. Stokes, Asst. Atty. Gen., Augusta, for State.

David E. Gray (orally), Bangor, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

GLASSMAN, Justice.

[¶ 1] Travis Therrien appeals from a judgment entered in the Superior Court (Penobscot County, *Kravchuk, J.*) following a jury verdict finding him guilty of manslaughter (Class A), 17–A M.R.S.A. § 203 (Supp.1996), for the death of Robert Reynolds. Therrien contends, *inter alia,* that the trial court erred by denying his requested jury instructions on voluntary conduct. We agree and vacate the judgment.[1]

[¶ 2] Therrien entered a plea of not guilty to the charge of intentionally or knowingly causing the death of Robert Reynolds in violation of 17–A M.R.S.A. § 201(1)(A) (1983).[2] The record reflects that at the trial on that charge the jury, *inter alia,* heard the following evidence: Robert Reynolds, aged 32 years, died shortly after sustaining a shotgun wound to the abdomen in the early morning hours of July 14, 1994, at a second-floor apartment on Silk Street in Brewer that Therrien, aged 19 years, shared with Chris Maxwell, aged 20 years. At approximately 1:00 a.m. on July 14, while walking to a convenience store, Therrien and Maxwell encountered Reynolds on the street near their apartment building. Although they had met Reynolds only once before, they were aware he indirectly supplied the marijuana they purchased from Reynolds' younger brother, Chris.[3] Both Therrien and Maxwell had consumed LSD and marijuana earlier that evening, but Therrien denied he was still affected by the drugs when they met Reynolds. They surmised Reynolds was drunk. Both Therrien and Maxwell related that Reynolds acted in a mocking and harassing manner, especially towards Maxwell.[4] The men testi-

---

1. Because we vacate the judgment on this ground, we need not address Therrien's other challenges to the jury instructions.

2. 17–A M.R.S.A. § 201(1)(A) provides, in pertinent part:
   1. A person is guilty of murder if:
      A. He intentionally or knowingly causes the death of another human being[.]

3. On occasion, Maxwell and Therrien had complained to Chris Reynolds because they felt that they had been shortchanged in these transactions. Chris told the pair that his brother had been to prison, was very tough, and would protect him. Maxwell and Therrien replied that they had loaded guns and could protect themselves.

4. Reynolds called Maxwell "Mr. 9–millimeter man" and stated "I own you" to him. Chris Reynolds testified that he recalled a conversation with Therrien in which he warned Therrien that people living in Therrien's apartment building

fied that they were intimidated by him and did not want to fight with him. At one point, Reynolds suddenly took a swing at Therrien, knocking off his baseball hat. After Maxwell went inside their apartment building, Therrien and Reynolds remained outside. After about ten minutes, Therrien told Reynolds it was late and he was going to bed and jumped onto the porch to go into the apartment building. Reynolds stepped onto the porch and said he wanted to show Therrien something and wanted to use the telephone to call his brother Chris. While Therrien had his hand on the knob of the door to the building and had again stated it was late and he had to go to bed, Reynolds grabbed his arm and said, "I've got to use your goddamn phone, I'm going to call Chris."

[¶ 3] Reynolds followed Therrien into the building. As Therrien and Reynolds came up the stairs, Therrien said to Reynolds, "You are just calling your brother Chris, right?" Reynolds replied "yes", and they proceeded up the stairs into the apartment. Therrien told Maxwell that Reynolds wanted to use the telephone and that nothing could be done about it. Once inside, Reynolds took off his coat, held it out with his left hand and said, "Look at me, boys, I'm not a very big man, what are you afraid of?" He then dropped his coat and sat down on a recliner facing away from the hall entrance to the living room, where he remained. Reynolds had no weapons.

[¶ 4] Reynolds did not attempt to call his brother Chris. Instead he sat quietly for a short time and then began again to orally harass Maxwell, who was also sitting in the living room. Therrien was originally seated in the living room with Maxwell and Reynolds, but after getting up to get a drink of water in the kitchen, remained in the living room archway located behind and to the right of where Reynolds was seated.

[¶ 5] Reynolds made several telephone calls while seated in the recliner. He told Therrien to look up telephone numbers and

dial the telephone. Both Maxwell and Therrien testified they were afraid to ask Reynolds to leave because they were convinced that ordering him to leave would have resulted in a fight. Reynolds told them "he had a 9–millimeter backing him up and that he knew how to use it and that you shouldn't— you shouldn't be talking about one if you're not prepared to use one." Therrien testified that Reynolds was acting in an unpredictable manner, intermittently orally harassing both him and Maxwell and boasting to them. This continued for approximately one hour.

[¶ 6] At approximately 3:10 a.m., Therrien decided that Reynolds had to leave. He walked to his bedroom to find another telephone to plug in and to call Reynolds' brother, Chris, to get Reynolds to leave. Unable to find the telephone, he testified that he wanted something to "equalize the situation" when he asked Reynolds to leave. Therrien searched unsuccessfully for his baseball bat and decided on his single-shot shotgun. He knew the gun was loaded.

[¶ 7] Therrien left the bedroom and walked down the hall toward the living room with the shotgun on his hip and his finger on the trigger. On direct examination he testified as follows:

Q. Okay. Did you approach Rob with the gun?

A. Yes, I did.

Q. And he was sitting down?

A. Yes, he was.

. . . .

Q. What did he do?

A. His right arm came out towards the gun, his torso twisted and his butt began to come off the seat.

Q. And how close were you to him at this time?

A. Real close.

. . . .

Q. Did you decide to shoot him at that point?

had children and that Therrien would have to keep the noise level down. Therrien had responded, "If anybody comes up here I've got a gun, I've got a 9–millimeter that will take care of them." Chris Reynolds could not recall whether

he mentioned the conversation to his brother Robert. The police recovered a pellet gun at Therrien's apartment that resembled a 9–millimeter.

A. I pulled the hammer back when he did that. I'm not—

Q. You pulled—you remember pulling the hammer back when he lunged at you?

A. Yes.

Q. Do you remember pulling the trigger?

A. I don't remember pulling the trigger, but I'm not denying it.

Q. It went off?

A. Oh yeah.

. . . .

Q. Were you surprised that Rob had been shot?

A. Yeah.

. . . .

Q. Are you suggesting that this was just one big accident?

A. I'm not saying that—you know, I'm not denying I shot the guy, but I mean, I didn't—my intention was never to hurt Rob Reynolds. My intention was to get him out of the house.

. . . .

Q. Why did you shoot him, Travis.

A. I didn't—I didn't shoot him because he wouldn't stay there. I didn't intend to shoot him, but he moved for my gun. He went to get my gun. That's a small apartment. It's a tight space.

Q. Did you shoot him so he wouldn't get the gun or don't you know?

A. No. Better that than, you know, have him get my gun, I guess.

Q. But did you think about it?

A. No. I didn't have—I didn't expect him to move for my gun.

Q. What did you expect him to do?

A. I expected him to sit tight and then I could get on with my you've got to leave, but it didn't happen.

On cross-examination, Therrien testified he was not sure if Reynolds' hand touched the gun when he moved from his seat after seeing the weapon. The shotgun used by Therrien had a five and one-half to six pound trigger pull, which is considered average for a weapon of this type.

[¶ 8] Maxwell, who did not see Therrien step into the living room with the gun or see the shooting, called 911. Maxwell testified that Reynolds was making gulping sounds and breathing heavily. Therrien said, "Oh my god, I did it," and then stated he was going to his parents' house and ran out the door. The Brewer police responded immediately and were joined by the Brewer Fire and Capitol Ambulance in an ultimately unsuccessful attempt to resuscitate Reynolds.[5]

[¶ 9] Soon after leaving the apartment, Therrien, in an agitated state, called the Brewer police and said, "I just shot the man. I'm at Texaco Brewer One Stop." A Brewer police cruiser en route to the shooting was diverted to that location to pick up Therrien. Therrien emerged from the store with his hands up and was taken into custody.

[¶ 10] Following the close of the evidence at the trial, the court, *inter alia*, instructed the jury on the elements of the offenses of murder, reckless or criminally negligent manslaughter and adequate provocation manslaughter.[6] Therrien requested, and the

5. An autopsy revealed that Reynolds died of a shotgun wound to the abdomen that severed the aorta and vena cava. At the time of his death, Reynolds' blood-alcohol level was .24.

6. 17–A M.R.S.A. § 203 (Supp.1996) provides in pertinent part:

1. A person is guilty of manslaughter if that person:

A. Recklessly, or with criminal negligence, causes the death of another human being;

B. Intentionally or knowingly causes the death of another human being under circumstances which do not constitute murder because the person causes the death while under the influence of extreme anger or extreme fear brought about by adequate provo-

cation. Adequate provocation has the same meaning as in section 201, subsection 4. The fact that a person causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation constitutes a mitigating circumstance reducing murder to manslaughter and need not be proved in any prosecution initiated under this subsection. . . .

17–A M.R.S.A. § 201(4) (Supp.1996) provides that provocation is adequate if:

A. It is not induced by the actor; and

B. It is reasonable for the actor to react to the provocation with extreme anger or extreme fear, provided that evidence demonstrating only that the actor has a tendency towards extreme anger or extreme fear shall

court gave, a jury instruction on self-defense. Therrien also requested that the court instruct the jury on voluntary conduct.[7] The trial court denied the request on the ground that the issue had not been generated by the evidence and would only confuse the jury. The jury returned a verdict of not guilty of murder, but guilty of manslaughter. From the judgment entered accordingly, Therrien appeals.

■ [¶ 11] Therrien contends that the court erred by failing to give his requested instruction on voluntary conduct within the purview of 17–A M.R.S.A. § 31(1). We agree.

[¶ 12] In *State v. Case*, 672 A.2d 586 (Me. 1996), we stated that "[t]o be voluntary an act must be the result of an exercise of defendant's conscious choice to perform [it], and not the result of reflex, convulsion, or other act over which a person has no control." *Id.* at 589 (quoting *State v. Mishne,*

427 A.2d 450, 458 (Me.1981)); *see State v. Flick,* 425 A.2d 167, 171 (Me.1981) (legal concept of voluntariness pursuant to section 31 distinguishes such conduct from reflex or nonvolitional action).[8] Viewing the evidence in the light most favorable to Therrien, Therrien testified that he did not intend to shoot Reynolds, he did not remember pulling the trigger, and he was surprised that Reynolds was shot. On this evidence, the jury could have concluded that the force applied to the trigger was involuntary.

■ [¶ 13] The jury verdict finding Therrien guilty of manslaughter gives no indication whether it was premised on Therrien's criminally negligent or reckless conduct or whether he acted with adequate provocation. In each instance, a determination whether Therrien had voluntarily or involuntarily pulled the trigger of the gun is a relevant factor to be considered by the jury. The jury, after considering all the attendant

---

not be sufficient, in and of itself, to establish the reasonableness of his reaction.

17–A M.R.S.A. § 35 (1983) defines the relevant culpable states of mind as follows:

  **1.** "Intentionally."

  **A.** A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.

  **B.** A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes that they exist.

  **2.** "Knowingly."

  **A.** A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.

  **B.** A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist.

  **3.** "Recklessly."

  **A.** A person acts recklessly with respect to a result of his conduct when he consciously disregards a risk that his conduct will cause such a result.

  **B.** A person acts recklessly with respect to attendant circumstances when he consciously disregards a risk that such circumstances exist.

  **C.** For purposes of this subsection, the disregard of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

  **4.** "Criminal negligence."

  **A.** A person acts with criminal negligence with respect to a result of his conduct when he fails to be aware of a risk that his conduct will cause such a result.

  **B.** A person acts with criminal negligence with respect to attendant circumstances when he fails to be aware of a risk that such circumstances exist.

  **C.** For purposes of this subsection, the failure to be aware of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

7. 17–A M.R.S.A. § 31 (1983) states, in pertinent part:

  **1.** A person commits a crime only if he engages in voluntary conduct. Voluntary conduct includes an act or a voluntary omission. Section 31 does not fall within the purview of and must be distinguished from the general rules governing defenses, affirmative defenses and justification set forth in Chapter 5 of 17–A M.R.S.A. (1983).

8. In *Case* we rejected the defendant's contention that based on evidence of her fear of abandonment by her husband, her pathologic devotion and blind obedience to him, she was entitled to an instruction pursuant to section 31. *See State v. Mishne*, 427 A.2d 450, 457 (Me.1981) (distinguishing between the applicability of section 31 (formerly section 51) and the defense of duress pursuant to section 103–A (formerly section 54)).

circumstances and Therrien's conduct culminating in the actual shooting, could find Therrien guilty of criminally negligent or reckless manslaughter notwithstanding its determination that his pulling of the trigger was an involuntary act. *See State v. Ledger*, 599 A.2d 813, 815 (Me.1991) (for purposes of manslaughter the terms "recklessly" or "criminally negligent" identify the accused's culpable mental state that State must prove by establishing that conduct of defendant involved gross deviation from standard of conduct that a reasonable and prudent person would observe in same situation). *See also State v. Burrell*, 135 N.H. 715, 609 A.2d 751, 753 (1992) (State is not required to prove that defendant's last act of pulling the trigger is voluntary in order to establish manslaughter). Because, however, the definition of adequate provocation manslaughter requires that the death be caused by intentional or knowing conduct, a finding by the jury that Therrien acted involuntarily when he pulled the trigger of the gun would foreclose a verdict of manslaughter on the ground of adequate provocation. It is axiomatic that one cannot intentionally and knowingly cause the death of another by an involuntary act. *State v. Lafferty*, 309 A.2d 647 669 (Me.1973). On the record in this case, we conclude the trial court erred by denying Therrien's request to instruct the jury on voluntariness.

The entry is:

Judgment vacated. Remanded for further proceedings consistent with the opinion herein.