Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 3, 2021

## 2021 CO 27

**No. 19SC986, *Dep't of Nat. Res. v. 5 Star Feedlot, Inc.* — §§ 33-6-110(1); 33-2-104(3), 33-2-105(4), 33-6-109(1), C.R.S. (2020) — Voluntary Act (Actus Reus) — "Take" Protected Wildlife.**

The supreme court affirms the judgment of the court of appeals. A plurality of the supreme court holds that when the State brings a civil action pursuant to section 33-6-110(1), C.R.S. (2020), to recover the value of wildlife that has allegedly been taken, it must prove by a preponderance of the evidence all the elements necessary for a conviction under a predicate statutory provision that makes it unlawful to take protected wildlife. Here, the State alleged that 5 Star Feedlot, Inc. ("5 Star") violated three such statutory provisions. The plurality therefore concludes that the State was required to prove that 5 Star performed the voluntary act proscribed by those taking statutory provisions (the actus reus). Consequently, the State had to prove that 5 Star, consciously and as a result of effort or determination, performed a voluntary act by which it killed or otherwise acquired possession of or control over the fish in question without authorization.

The only evidence presented by the State of a voluntary act performed by 5 Star was the lawful, years-long operation of wastewater containment ponds. But the lawful, longstanding operation of such ponds wasn't, even according to the State's complaint, an act through which 5 Star killed or otherwise acquired possession of or control over the fish. Rather, as the State admitted in its complaint, the *discharge* from one of 5 Star's wastewater containment ponds led to the fish's destruction. That discharge, however, was triggered by an act of God—a once-in-a-half-century rainstorm—not an act voluntarily performed by 5 Star. Since the State failed to formally allege, never mind present proof, that 5 Star's lawful, years-long operation of wastewater containment ponds killed or otherwise acquired possession of or control over the fish, it could not satisfy the voluntary act or actus reus requirement of the taking statutory provisions.

Hence, the court of appeals correctly concluded that the district court erred both in entering summary judgment against 5 Star and in denying 5 Star's cross-motion. Accordingly, the supreme court affirms the court of appeals' judgment, albeit on narrower grounds, and remands with instructions to return the case to the district court for entry of judgment against the State and in 5 Star's favor.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2021 CO 27**

**Supreme Court Case No. 19SC986**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 18CA1131

**Petitioners:**

State of Colorado, Department of Natural Resources; and Parks and Wildlife
Commission and Division of Parks and Wildlife,

v.

**Respondent:**

5 Star Feedlot, Inc.

**Judgment Affirmed**
*en banc*
May 3, 2021

**Attorneys for Petitioners:**
Philip J. Weiser, Attorney General
Christopher G. Breidenbach, Assistant Attorney General
Joseph G. Michaels, Senior Assistant Attorney General
*Denver, Colorado*

**Attorneys for Respondent:**
Richards Carrington, LLC
Christopher P. Carrington
Ruth M. Moore
*Denver, Colorado*

**Attorneys for Amici Curiae Colorado Livestock Association, Colorado Farm Bureau, Colorado Corn Growers Association, Colorado Cattlemen's Association, and National Cattlemen's Beef Association:**
Witwer, Oldenburg, Barry & Groom, LLP
John J. Barry
Kent A. Naughton
 *Greeley, Colorado*

**Attorneys for Amicus Curiae Pacific Legal Foundation:**
Jeffrey W. McCoy
 *Sacramento, California*

Oliver J. Dunford
 *Palm Beach Gardens, Florida*

**JUSTICE SAMOUR** announced the judgment of the Court and delivered an opinion, in which **CHIEF JUSTICE BOATRIGHT** and **JUSTICE GABRIEL** join.
**JUSTICE MÁRQUEZ** concurs in the judgment only.
**JUSTICE HOOD** dissents, and **JUSTICE HART** and **JUSTICE BERKENKOTTER** join in the dissent.

¶1     In a 1970s hit song, John Fogerty asks—in his trademark raspy snarl—"And I wonder, still I wonder, who'll stop the rain?"  Creedence Clearwater Revival, *Who'll Stop the Rain*, *on* Cosmo's Factory (Fantasy Records 1970).  Many a person in eastern Colorado may have pondered this rhetorical question in the spring of 2015, when a severe three-day storm deluged the area with over six inches of rain.  Two inches of water fell within thirty minutes on the first day, a once-in-a-half-century occurrence.  During the storm, a mixture of wastewater and rainwater overflowed from one of the wastewater containment ponds in a cattle feedlot operated by 5 Star Feedlot, Inc. ("5 Star").  That water then crossed several miles of land and ultimately found its way to the South Fork of the Republican River, killing an estimated 15,000 fish and giving rise to this litigation.

¶2     Pursuant to section 33-6-110(1), C.R.S. (2020), the State initiated a civil action against 5 Star.  The State sought to recover the value of the deceased fish based on 5 Star's alleged violation of three predicate statutory provisions ("taking statutory provisions") which, with some exceptions not pertinent here, make it unlawful for any person to "take"—i.e., to kill or otherwise acquire possession of or control over—certain wildlife.  The parties filed cross-motions for summary judgment on the issue of liability.  The district court denied 5 Star's motion, granted the State's motion, and, following a bench trial on damages, ordered 5 Star to pay the State $625,755.  5 Star then appealed.

3

¶3    The court of appeals reversed, holding that the taking statutory provisions required the State to prove that 5 Star acted knowingly or, at minimum, performed an unlawful voluntary act. Because it found that the State had failed to present any evidence of either element, the court of appeals remanded for entry of judgment in 5 Star's favor.

¶4    We now hold that the State was required to prove that 5 Star performed the voluntary act proscribed by the taking statutory provisions (the actus reus).[1] Consequently, the State had to prove that 5 Star, consciously and as a result of effort or determination, performed a voluntary act by which it killed or otherwise acquired possession of or control over the fish without authorization.

¶5    The only evidence presented by the State of a voluntary act performed by 5 Star was the lawful, years-long operation of wastewater containment ponds. But the lawful, longstanding operation of such ponds wasn't, even according to the State's complaint, an act through which 5 Star killed or otherwise acquired possession of or control over the fish. Rather, as the State admitted in its complaint, it was the *discharge* from one of 5 Star's wastewater containment ponds that led to the fish's destruction. That discharge, however, was triggered by an act

---

[1] As relevant here, the taking statutory provisions have the same actus reus, as they proscribe the same voluntary act.

4

of God—the rainstorm—not an act voluntarily performed by 5 Star. Since the State failed to formally allege, never mind present proof, that 5 Star's lawful, years-long operation of wastewater containment ponds killed or otherwise acquired possession of or control over the fish, it could not satisfy the voluntary act or actus reus requirement of the taking statutory provisions.

¶6 Hence, we agree with the court of appeals that the district court erred both in entering summary judgment against 5 Star and in denying 5 Star's cross-motion. Given this conclusion, we need not, and thus do not, decide whether the State was also required to prove that 5 Star acted knowingly. Accordingly, we affirm the court of appeals' judgment, albeit on narrower grounds, and remand with instructions to return the case to the district court for entry of judgment against the State and in 5 Star's favor.

## I. Facts and Procedural History

¶7 5 Star runs a cattle feedlot in eastern Colorado near the South Fork of the Republican River and Hale Ponds. As part of its operations, 5 Star uses containment ponds to store wastewater. There is no finding in the record that these ponds—each of which can hold more than twenty-four million gallons of wastewater—were built or maintained in violation of any Colorado law, rule, or

regulation. Indeed, the State did not ask the district court to make any such finding.[2]

¶8 Within three miles of 5 Star's feedlot is the South Fork of the Republican River, which is home to an array of wildlife, including the southernmost population of the Brassy Minnow, a threatened species, and rare fish like the Stonecat and Orangethroat Darter. The river flows through the South Republican State Wildlife Area and feeds Hale Ponds, which are among the scarce locations for public sportfishing in the region.

¶9 In the spring of 2015, an act of God—a three-day rainstorm of historic proportions—impacted both 5 Star's feedlot and the South Fork of the Republican River. More than six inches of water inundated the area. On the first day alone, two inches fell within thirty minutes, a phenomenon which, on average, takes place only twice every century. The extreme rainstorm caused overflow from, and a partial breach in, one of 5 Star's wastewater containment ponds. A mixture of wastewater and rainwater then escaped from that pond. Despite 5 Star's prompt

---

[2] Pursuant to its review of the record, the court of appeals discerned that the State had "concede[d] that 5 Star's containment ponds comply with all relevant Colorado laws." *Dep't of Nat. Res. v. 5 Star Feedlot, Inc.*, 2019 COA 162M, ¶ 3 n.1, __ P.3d __. We don't have to go that far. Instead, we are content to indicate that the record supports the conclusion that 5 Star's operation of its containment ponds at the time of the rainstorm was lawful.

corrective measures, 500,000 gallons of wastewater and rainwater eventually flowed over several miles of land and into the river. A few days later, the State recovered 379 dead fish from the river and 1,389 dead fish from Hale Ponds.[3]

¶10 The State filed a complaint against 5 Star under section 33-6-110(1), which authorizes the Colorado Division of Parks and Wildlife to "bring . . . a civil action against any person, in the name of the people of the state, to recover possession or value or both possession and value of any wildlife *taken* in violation of articles 1 to 6" of title 33. (Emphasis added.) In its amended complaint, the State alleged that 5 Star had violated the taking statutory provisions, which make it unlawful to "take" protected wildlife:

- Section 33-2-104(3), C.R.S. (2020), states that, except as otherwise provided in regulations issued by the Parks and Wildlife Commission ("the Commission"), "it is unlawful for any person to *take* . . . nongame wildlife" that the Commission has deemed to be in need of management;

- Section 33-2-105(4), C.R.S. (2020), states that, except as otherwise provided in article 33, "it is unlawful for any person to *take* . . . any species or subspecies of wildlife appearing on the list of wildlife indigenous to this state determined to be threatened within the state pursuant to subsection (1) of this section"; and

---

[3] Based on the dead fish collected, the State estimated that approximately 15,000 fish died. Because the district court arrived at its damage calculation of $625,755 using that estimate, and because it doesn't affect our analysis, we accept the estimate at face value.

7

- Section 33-6-109(1), C.R.S. (2020), states that "[i]t is unlawful for any person to . . . *take* . . . any wildlife that is the property of this state as provided in section 33-1-101, except as permitted by articles 1 to 6" of title 33 or by rule or regulation of the Commission.

(Emphases added.)[4]  It is uncontested that the fish that perished were protected under one or more of these provisions.

¶11    Relying on C.R.C.P. 12(b)(5), 5 Star filed a motion to dismiss, asserting that it hadn't taken any fish.  After the district court denied that motion, the parties filed cross-motions for summary judgment.  The State argued that the fish had died and that 5 Star was strictly liable for such deaths.  Although it acknowledged that the taking statutory provisions declare certain conduct "unlawful," the State nonetheless claimed that it was under no obligation to present evidence of either a culpable mental state (mens rea) or a voluntary act (actus reus).  5 Star, in turn, maintained that the State (1) was required to prove that 5 Star both acted with the culpable mental state of knowingly and performed an unlawful voluntary act, but had presented evidence of neither element, and (2) had failed to establish a

---

[4] The taking statutory provisions prohibit acts other than "tak[ing]" protected wildlife.  However, those prohibited acts are not pertinent here.  Thus, our discussion of the voluntary act or actus reus required by the taking statutory provisions is limited to "tak[ing]" protected wildlife.

genuine issue of material fact on the issue of causation in opposing 5 Star's summary judgment motion.

¶12 In a lean order, the district court denied 5 Star's motion and granted the State's motion. After implying that 5 Star had taken the fish by killing the fish, it ruled that 5 Star was strictly liable. The court added that no genuine issue of material fact remained on the issue of liability. The case then proceeded to a bench trial on the issue of damages. The court ultimately ordered 5 Star to pay $625,755 to the State.

¶13 5 Star appealed, raising three contentions: (1) it was not liable for the fish's deaths because it had neither acted with the culpable mental state of knowingly nor performed an unlawful voluntary act that killed or otherwise acquired possession of or control over the fish; (2) genuine issues of material fact remained that rendered the grant of the State's summary judgment motion erroneous; and (3) its own motion for summary judgment should have been granted because the State had presented insufficient evidence as to the cause of the fish's demise. Believing that the State's motion had been mistakenly granted and that its cross-motion had been mistakenly denied, 5 Star asked the court to reverse the summary judgment in favor of the State and to remand with instructions to enter judgment in favor of 5 Star.

9

¶14 Siding with 5 Star, a split division of the court of appeals reversed in a published opinion. *Dep't of Nat. Res. v. 5 Star Feedlot, Inc.*, 2019 COA 162M, ¶ 2, __ P.3d __. The majority of the division concluded that the district court had misinterpreted the taking statutory provisions. *Id.* More specifically, the division agreed with 5 Star's first contention and held that the State was required to prove that 5 Star both acted knowingly and committed an unlawful voluntary act by which it killed or otherwise acquired possession of or control over the fish. *Id.* at ¶¶ 16, 27. Finding that the State had failed to present evidence of either element, the division reversed the district court's judgment and remanded with instructions to enter judgment in 5 Star's favor.[5] *Id.* at ¶¶ 26, 31, 42. Of particular relevance here, the division explained that, even assuming, as the State contended, that the taking statutory provisions create strict liability crimes, the State still could not prevail given its failure to argue, let alone prove, that 5 Star performed an unlawful voluntary act. *Id.* at ¶¶ 27, 29, 31.

¶15 Judge Fox concurred in part and dissented in part. *Id.* at ¶¶ 43–50 (Fox, J., concurring in part and dissenting in part). Though she agreed that the State was

---

[5] The division didn't reach 5 Star's second and third contentions.

10

not entitled to summary judgment, she disagreed that summary judgment in 5 Star's favor was warranted. *Id.* at ¶¶ 43, 49.

¶16 The State then sought our intervention. In its petition for review, it asserted that (1) it didn't have to prove that 5 Star acted with a culpable mental state because, in its view, the taking statutory provisions describe strict liability offenses, and (2) it was required to prove that 5 Star committed any voluntary act (not necessarily an *unlawful* voluntary act). We accepted the State's appeal.[6]

## II. Analysis

¶17 Before we up-anchor and set sail, we brush up on the applicable standards of review and the relevant principles of statutory interpretation. With our course illuminated by these lighthouses, we embark on our analytical voyage and consider whether the State was required to prove an unlawful voluntary act, as the division ruled. We hold that the State was required to prove that 5 Star performed the voluntary act proscribed by the taking statutory provisions (the actus reus). Consequently, the State had to prove that 5 Star, consciously and as a

---

[6] We decided to address both issues raised by the State:

1. Whether proving a violation of the take statutes requires evidence of knowing conduct.

2. Whether proving a violation of the take statutes requires evidence of a voluntary act that is itself illegal.

11

result of effort or determination, killed or otherwise acquired possession of or control over the fish without authorization. We end by concluding that the State presented no such evidence and that, therefore, the district court erred both in granting the State's motion for summary judgment and in denying 5 Star's cross-motion. In view of this disposition, we leave for a future expedition the question of whether the taking statutory provisions impose strict liability or require proof of the culpable mental state of knowingly.

## A. Applicable Standards of Review and Relevant Principles of Statutory Interpretation

¶18 We review de novo an order granting summary judgment. *People ex rel. Rein v. Meagher*, 2020 CO 56, ¶ 19, 465 P.3d 554, 559. Hence, when reviewing such an order, we apply the same legal standard as the district court. *City of Longmont v. Colo. Oil & Gas Ass'n*, 2016 CO 29, ¶ 9, 369 P.3d 573, 578.

¶19 It is apodictic that summary judgment is a drastic remedy reserved for those situations in which it is clear that the applicable legal standard has been satisfied. *Rein*, ¶ 21, 465 P.3d at 559. Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* at ¶ 19, 465 P.3d at 559 (quoting C.R.C.P. 56(c)). The court must afford the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from

12

the undisputed facts. *Id.* at ¶ 20, 465 P.3d at 559. Conversely, the court must resolve all doubts against the moving party. *Id.* That's not to suggest that the nonmoving party may simply rest on the allegations and demands in its pleadings. *Id.* To survive a summary judgment motion, the nonmoving party must put forth specific facts demonstrating that there is a genuine issue for trial. *Id.*

¶20　　We also review questions of statutory interpretation de novo. *Id.* at ¶ 22, 465 P.3d at 559. In interpreting a statute, we aim to ascertain and give effect to the General Assembly's intent. *Linnebur v. People*, 2020 CO 79M, ¶ 9, 476 P.3d 734, 736–37. To do so, we consider first the plain language of the statute, giving the words and phrases their plain and ordinary meaning. *Id.*, 476 P.3d at 737. We look to the entire statutory scheme because we are required to give consistent, harmonious, and sensible effect to all its parts, while simultaneously avoiding constructions that would either render any of its words or phrases superfluous or yield illogical or absurd results. *Elder v. Williams*, 2020 CO 88, ¶ 18, 477 P.3d 694, 698. If the statute is unambiguous—i.e., if it is not reasonably susceptible to multiple interpretations—we apply it as written and refrain from resorting to other rules of statutory construction. *Id.*

## B. The State Was Required to Prove the Voluntary Act
## Proscribed by the Taking Statutory Provisions
## (the Actus Reus)

¶21    5 Star claims, the State concedes, and we conclude that the State could prevail on its civil claim only if it proved that 5 Star violated at least one of the predicate taking statutory provisions. While the State had to prove any such violation only by a preponderance of the evidence (not beyond a reasonable doubt) because this is a civil (not criminal) case, it was nevertheless required to prove all the elements necessary for a conviction. § 33-6-110(1); *cf. Itin v. Ungar*, 17 P.3d 129, 133 (Colo. 2000) (holding that recovery of treble damages under the civil theft statute requires a plaintiff to prove by a preponderance of the evidence "the elements" necessary "to establish a defendant's liability for the crime" of theft). The plain language in section 33-6-110(1) makes this clear: The State may "bring and maintain a civil action against any person . . . to recover possession or value or both . . . of any wildlife taken *in violation of articles 1 to 6 of this title*." (Emphasis added.) All three taking statutory provisions reside in articles 2 and 6 of title 33 and pronounce certain conduct unlawful.[7]

---

[7] The provisions of the criminal code "do not bar, suspend, or otherwise affect any right [to] or liability [for] damages . . . authorized by law to be recovered . . . in a civil action." § 18-1-103(3), C.R.S. (2020). However, "unless the context otherwise requires," the provisions of the criminal code "govern the construction of . . . any offense defined in any statute of this state." § 18-1-103(1).

14

¶22 As pertinent here, each taking statutory provision prohibits the unauthorized taking of protected wildlife. In 2015, when the rainstorm led to overflow from one of 5 Star's wastewater containment ponds, section 33-1-102(43), C.R.S. (2015), defined "[t]ake" to mean "to acquire possession of wildlife; but such term shall not include the accidental wounding or killing of wildlife by a motor vehicle, vessel, or train."[8] Possession meant (in 2015) and continues to mean "either actual or constructive possession of or any control over the object referred to." § 33-1-102(34). The parties see eye to eye on the applicability of these definitions. Where the parties diverge is on the elements of the predicate criminal offenses defined by the taking statutory provisions. Because this civil action is moored to those offenses, their elements are pivotal.

¶23 The parties skirmish over two questions related to the elements of the offenses underlying this civil action: (1) Do the taking statutory provisions impose strict liability or was the State required to prove that 5 Star acted with the culpable

_____

[8] In 2020, the legislature amended the definition of "[t]ake" as follows: "to *kill or otherwise* acquire possession of wildlife; except that the term does not include the accidental wounding or killing of wildlife by a motor vehicle, vessel, or train." Ch. 49, sec. 1, § 33-1-102(48), 2020 Colo. Sess. Laws 167, 167 (emphasis added to underscore the substantive part of the amendment). We assume without deciding that, with some exceptions not relevant here, the 2015 definition of "[t]ake" included the killing of the wildlife identified in the taking statutory provisions.

mental state of knowingly?; and (2) Was the State required to prove that 5 Star committed an unlawful voluntary act or simply a voluntary act? Resolution of the latter is dispositive, so we pass no judgment on the former.

¶24    The State avers that the voluntary act or actus reus prong of criminal liability in Colorado does not require proof of an *unlawful* act.[9]  5 Star counters that the State was required to prove the voluntary act proscribed by the taking statutory provisions. We agree with 5 Star.

¶25    Our General Assembly has declared that "[t]he minimum requirement for criminal liability is the performance by a person of conduct which includes a *voluntary act* or the omission to perform an act which he is physically capable of performing."[10] § 18-1-502, C.R.S. (2020) (emphasis added). "Voluntary act" means "an act performed consciously as a result of effort or determination." § 18-1-501(9), C.R.S. (2020). An "[a]ct," in turn, is defined as "a bodily movement." § 18-1-501(1).

---

[9] Before the division, the State largely sang a different tune. Its chief argument there was that there is no voluntary act requirement in the taking statutory provisions because, in its view, they create strict liability offenses. The division had no trouble rejecting this contention, and we devote no time to it because the State abandoned it before knocking on our door.

[10] The State does not rely on an alleged omission by 5 Star. For that reason, and for the sake of simplicity, we do not analyze the concept of omission of an act in this opinion.

16

¶26 Of course, not all voluntary conduct is subject to criminal liability. After all, the law doesn't impose liability on the blameless. *People v. Marcy*, 628 P.2d 69, 73 (Colo. 1981), *superseded by statute*, § 18-3-102(1)(d), C.R.S. (1986), *as recognized in People v. Lee*, 2020 CO 81, ¶¶ 14–16, 476 P.3d 351, 354–55. As we proclaimed in *Marcy* four decades ago, a person is generally not subject to criminal liability for his conduct unless there is "an *unlawful* act (actus reus) and a culpable mental state (mens rea)." *Id.* (emphasis added). Here, our focus is on the actus reus prong of criminal liability.

¶27 Black's Law Dictionary defines actus reus as:

1. The *wrongful* deed that comprises the physical components of a crime and that generally must be coupled with mens rea to establish criminal liability; a *forbidden* act <the actus reus for theft is the taking of or unlawful control over property without the owner's consent>.

2. The voluntary act . . . , the attendant circumstances, and the social harm caused by a *criminal* act, all of which make up the physical components of a crime. — Also termed *deed of crime*; *overt act*.

*Actus Reus*, Black's Law Dictionary (11th ed. 2019) (first two emphases added); *see also id.* (quoting Glanville Williams, *Criminal Law: The General Part* 19 (2d ed. 1961), for the following propositions: (1) in the event "the specification of a crime includes a number of circumstances, all of these are essential and all must be regarded as part of the *actus reus*"; and (2) "[t]he view that *actus reus* means *all* the

17

external ingredients of the crime is not only the simplest and clearest but the one that gives the most satisfactory results.").

¶28 Colorado jurisprudence has long treated the "voluntary act" required by section 18-1-502 synonymously with the "actus reus" of the offense and has made clear that the terms refer to the voluntary act *proscribed by the statute* defining the offense (i.e., the voluntary act rendered *unlawful* by the statute defining the offense). *Marcy* is illustrative. *See* 628 P.2d at 73 (pointing out that the minimum requirements for criminal liability in Colorado are an "unlawful act" or the "actus reus" and a "culpable mental state" or "mens rea"). And *Marcy* keeps good company. *See, e.g., Gorman v. People*, 19 P.3d 662, 665 (Colo. 2000) (referring to "the actus reus" as "an unlawful act"); *Hendershott v. People*, 653 P.2d 385, 390 (Colo. 1982) (same); *People v. Hoskay*, 87 P.3d 194, 198 (Colo. App. 2003) (same).

¶29 We have made similar declarations in other cases. In *People v. Wilhelm*, after acknowledging that the General Assembly has enacted strict liability offenses, which do not contain a culpable mental state or mens rea requirement,[11] we explained that such offenses simply require "proof . . . that the *prohibited conduct* was 'the product of conscious mental activity involving effort or determination.'"

---

[11] *See* § 18-1-502 (providing that when a culpable mental state or mens rea is not required for the commission of an offense, "the offense is one of 'strict liability'").

676 P.2d 702, 706 (Colo. 1984) (emphasis added) (quoting *People v. Rostad*, 669 P.2d 126, 129 (Colo. 1983)). Similarly, in *Rostad*, we said that "the minimal requirement for a 'strict liability' offense is proof that the *proscribed conduct* was performed voluntarily." 669 P.2d at 129 (emphasis added). And in *People v. Caddy*, we noted that it was "well settled that the legislature may make a *prohibited act* a crime, irrespective of the elements of intent or scienter, when public policy so requires." 540 P.2d 1089, 1090 (Colo. 1975) (emphasis added).

¶30 Not surprisingly, the Colorado Model Criminal Jury Instructions have followed suit. COLJI-Crim. G1:01 recommends instructing jurors in all but strict liability cases as follows: "A crime is committed when the defendant has committed a voluntary act *prohibited by law*, together with a culpable state of mind." (Emphasis added.)

¶31 Therefore, here, the State could not prevail unless it proved that 5 Star committed the voluntary act proscribed by the taking statutory provisions.[12] Though the State disputes this point and argues that *any* voluntary act—not necessarily the voluntary act proscribed by the taking statutory provisions—

---

[12] To the extent that the division's references to an "unlawful" voluntary act meant the voluntary act proscribed by the taking statutory provisions, its analysis aligns with ours.

19

would have sufficed, it ultimately concedes in its reply brief that it was required to prove that 5 Star killed or otherwise acquired possession of or control over the fish without authorization. But that's precisely the voluntary act proscribed by the taking statutory provisions (i.e., the actus reus). As the State reluctantly acknowledges, what the taking statutory provisions proscribe is any voluntary act that kills or otherwise acquires possession of or control over certain wildlife without authorization.

¶32 So, did the State present proof of the voluntary act proscribed by the taking statutory provisions? We turn to that question next.

### C. The District Court Erred in Granting the State's Motion for Summary Judgment

¶33 In the district court, the State presented no evidence that 5 Star performed a voluntary act by which it killed or otherwise acquired possession of or control over the fish without authorization. Accordingly, the State failed to satisfy the voluntary act or actus reus requirement of the taking statutory provisions.

¶34 The voluntary act the State alleged 5 Star performed was the lawful, years-long operation of wastewater containment ponds. But 5 Star's lawful, longstanding operation of wastewater containment ponds was not proscribed by the taking statutory provisions because such operation didn't kill or otherwise acquire possession of or control over the fish.

20

¶35 Significantly, the State's complaint didn't even allege that 5 Star's lawful, longstanding operation of wastewater containment ponds killed or otherwise acquired possession of or control over the fish. The State's theory was that the "discharge" of a mixture of wastewater and rainwater from one of 5 Star's containment ponds killed the fish. That discharge, however, was triggered by the rainstorm, which was certainly not an act performed by 5 Star, much less an act 5 Star undertook "consciously as a result of effort or determination." § 18-1-501(9).

¶36 The State's attempt to analogize 5 Star's lawful, long-term operation of wastewater containment ponds to the situation we dealt with in *People v. Garcia* misses the mark. 541 P.2d 687 (Colo. 1975), *superseded by statute*, § 18-4-105, C.R.S. (1977), *as recognized in Copeland v. People*, 2 P.3d 1283, 1285 (Colo. 2000). Indeed, *Garcia* actually undercuts the State's position. There, the defendant lodged a constitutional challenge against the fourth degree arson statute, which, at the time, made it unlawful for anyone to "start[] or maintain[] a fire on . . . his own property or that of another" when doing so "place[d] any building or occupied structure of another in danger of damage." *Id.* at 688 (quoting section 18-4-105(1), C.R.S.

21

(1973)).[13]  The defendant argued, among other things, that the statute reached constitutionally protected conduct.  *Id.* at 689.  In rejecting the claim, we relied on section 18-1-502's general prerequisites for criminal liability and held that the prosecution was required to prove that the defendant had performed the voluntary act proscribed by the statute.  *Id.*  We reasoned that a person could not be found guilty if the fire was started "by events beyond [his] control."  *Id.*

¶37    Our holding today jibes with *Garcia*.  Just as a defendant can't be found guilty of fourth degree arson if the fire was started by events beyond his control, a defendant can't be found guilty of taking protected wildlife without authorization under one of the taking statutory provisions if the taking was accomplished by events beyond his control.  Regardless of whether the culprit was fire or water, criminal liability may not attach in either scenario if the defendant did not perform the voluntary act proscribed by the statute defining the offense.  Thus, although the State seeks refuge in *Garcia*, we perceive nothing in *Garcia* that can reasonably be read as relieving the State of its burden to prove that 5 Star

---

[13] Two years after we decided *Garcia*, the legislature amended section 18-4-105 by adding the mens rea of "knowingly or recklessly."  *Copeland*, 2 P.3d at 1285 (quoting §§ 18-4-105 and 18-4-106, C.R.S. (1999)).

22

performed a voluntary act *by which it killed or otherwise acquired possession of or control over the fish without authorization*.

¶38 The flaw in the State's analytical approach in the district court was that it seemed to analyze this case through the prism of a negligence tort.[14] But tort principles can't be shoehorned into section 33-6-110(1) because that statutory provision doesn't authorize the State to recover by proving a civil negligence claim. Rather, as we observed above, section 33-6-110(1) requires proof establishing a criminal offense pursuant to one of the taking statutory provisions. And the voluntary act or actus reus required by each such offense (i.e., the voluntary act proscribed) is killing or otherwise acquiring possession of or control over certain wildlife without authorization. Contrary to the State's suggestion, that voluntary act or actus reus requirement can't be satisfied by proof of *any* voluntary act without regard to whether such act killed or otherwise acquired possession of or control over the fish without authorization.

¶39 In short, to borrow from the old idiom, the State brought a negligence-tort knife to an actus-reus gun fight and, as this opinion demonstrates, it could not

---

[14] To establish a prima facie case for a negligence tort claim, a plaintiff must show that the defendant, having a legal duty of care, breached that duty through *any* act or omission, and that such act or omission caused the plaintiff's injury. *See Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P.3d 1067, 1074 (Colo. 2010).

23

withstand 5 Star's summary-judgment salvo.  Because the State didn't even allege in its complaint that 5 Star's sole voluntary act—the lawful, years-long operation of wastewater containment ponds—killed or otherwise acquired possession of or control over the fish without authorization, the district court erred in granting the State's motion for summary judgment.[15]

¶40     Our work isn't done yet, though, because the denial of 5 Star's cross-motion for summary judgment is also before us.  We explore that aspect of 5 Star's appeal below.

### D.  The District Court Also Erred in Denying 5 Star's Motion for Summary Judgment

¶41     An order denying a motion for summary judgment is generally not appealable because it doesn't terminate the litigation.  *Glennon Heights, Inc. v. Cent.*

---

[15] The State admits in its opening brief that the issue of "causation . . . is not before this Court."  True to this concession, the State discusses causation and related concepts (such as foreseeability) only in the limited context of arguing that interpreting the taking statutory provisions as imposing strict liability does not give rise to any constitutional infirmities because, in its view, a "proximate cause requirement" is automatically imported into those provisions.  Since we do not reach the mens rea question, however, that contention is irrelevant.  And we do not otherwise discuss causation because ours is an adversarial system of justice that adheres to the party presentation principle, which puts the onus on the parties to frame the issues to be decided while assigning to courts the role of neutral arbiters of the matters raised by the parties.  *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).  As the division put it, courts "should not be making arguments for a party."  *Dep't of Nat. Res.*, ¶ 40.  Attorneys, not judicial officers, should lawyer cases.

*Bank & Tr.*, 658 P.2d 872, 875 (Colo. 1983). However, as the division astutely recognized, where the parties file cross-motions for summary judgment on the issue of liability and the district court grants one, denies the other, and then resolves the issue of damages at a bench trial, the judgment is final and we may review the order denying summary judgment. *See Dep't of Nat. Res.*, ¶ 36 (citing *Yaffe Cos., Inc. v. Great Am. Ins. Co.*, 499 F.3d 1182, 1184 (10th Cir. 2007)).

¶42   In its motion for summary judgment, 5 Star relied on the lack of any argument or evidence by the State regarding the voluntary act or actus reus required by the taking statutory provisions. As such, it was incumbent on the State to come forward with evidence demonstrating the existence of a genuine issue of material fact vis-à-vis that requirement. *Rein*, ¶ 20, 465 P.3d at 559. Because the State failed to do so, the district court erred in denying 5 Star's motion and we now direct the entry of judgment against the State and in favor of 5 Star. *See In re Estate of Scott*, 119 P.3d 511, 515–16 (Colo. App. 2004) (directing entry of judgment for the party whose summary judgment motion was denied by the district court because no factual issue remained); *Udis v. Universal Commc'ns Co.*, 56 P.3d 1177, 1183 (Colo. App. 2002) (same); *see also Witcher v. Canon City*, 716 P.2d 445, 456–57 (Colo. 1986) (explaining that a party's failure to challenge evidence presented in support of a motion for summary judgment in the district court waives any such challenge on appeal).

### III. Conclusion

¶43    We affirm the division's judgment, albeit on narrower grounds.  And we remand with instructions to return the case to the district court to enter judgment against the State and in 5 Star's favor.

**JUSTICE MÁRQUEZ** concurs in the judgment only.
**JUSTICE HOOD** dissents, and **JUSTICE HART** and **JUSTICE BERKENKOTTER** join in the dissent.

JUSTICE MÁRQUEZ, concurring in the judgment only.

¶44 The State seeks to hold 5 Star Feedlot, Inc. liable for the effects of an extreme, fifty-year rainstorm event that caused 5 Star's wastewater containment ponds to overflow and allegedly resulted in the death of approximately 15,000 fish several miles away. The question before us is whether 5 Star may be held liable for this result, not as a matter of tort (say, as a proximate and foreseeable result of the negligent construction or maintenance of the containment ponds), but in violation of statutory provisions that make it unlawful to "take" wildlife. I agree with the plurality that the State failed to plead a case that could survive 5 Star's motion for summary judgment, but I do not join its reasoning. Instead, I conclude that, as a matter of plain language and viewing the wildlife code as a whole, the "taking" of wildlife requires knowing or intentional conduct directed at wildlife. Here, because the State failed to allege knowing or intentional conduct by 5 Star amounting to a "taking" of wildlife, its case cannot survive summary judgment. Because I agree that the case should be remanded to the district court for entry of summary judgment in favor of 5 Star, but do not join the rationale of the plurality opinion, I respectfully concur in the judgment only.

## I. Principles of Statutory Interpretation

¶45 In interpreting statutes, our role is to ascertain and give effect to the legislature's intent. *See People v. Harrison*, 2020 CO 57, ¶ 16, 465 P.3d 16, 20. To this

end, we first look to the language of a statute, giving terms their plain and ordinary meaning. *Id.* If a word has a recognized common law meaning and history, we may also look to that history to determine the meaning of ambiguous terms. *See Norton v. Gilman*, 949 P.2d 565, 567 (Colo. 1997); *Allen v. People*, 485 P.2d 886, 887–88 (Colo. 1971). We are also "required to read the words and phrases in a statute in context." *Harrison*, ¶ 17, 465 P.3d at 20. Thus, a statutory term "appearing in a series should be understood . . . to have a meaning commensurate with or in the general nature of the things with which it has been grouped." *People v. Opana*, 2017 CO 56, ¶ 14, 395 P.3d 757, 761. And, when interpreting statutory provisions that are part of a broader legislative scheme, we endeavor to "read that scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts." *Thompson v. People*, 2020 CO 72, ¶ 22, 471 P.3d 1045, 1051.

## II. "Take" Requires Knowing or Intentional Conduct

¶46     Section 33-6-110(1), C.R.S. (2020), authorizes the Colorado Division of Parks and Wildlife to bring a civil action to recover possession and/or value of any wildlife "taken in violation of articles 1 to 6 of this title."[1] Here, the State alleged violations of sections 33-2-104(3), 33-2-105(4), and 33-6-109(1), C.R.S. (2020), which

---

[1] Consistent with the parties' usage, I refer to articles 1 to 6 of Title 33 as the "wildlife code."

make it unlawful to "take" certain wildlife. Section 33-6-109(1) makes it unlawful for anyone to "hunt, take, or have in such person's possession" any wildlife that is the property of the State, except as permitted under the wildlife code or by rule or regulation of the Parks and Wildlife Commission. Sections 33-2-104(3) and 33-2-105(4) similarly make it unlawful to "take" nongame or threatened wildlife. At the time of 5 Star's alleged offense, the wildlife code defined "take" to mean "to acquire possession of wildlife; but such term shall not include the accidental wounding or killing of wildlife by a motor vehicle, vessel, or train." § 33-1-102(43), C.R.S. (2015).

¶47 As Justice Scalia once observed, in the context of wildlife, the term "take" is "as old as the law itself," and means "to reduce those animals, by killing or capturing, to human control." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 717 (1995) (Scalia, J., dissenting) (tracing the right to "take" wild animals back to ancient Roman law); *see also id.* (citing, *inter alia*, 2 William Blackstone, Commentaries *411 (1766) ("Every man . . . has an equal right of pursuing and taking to his own use all such creatures as are *ferae naturae*.")). Under the traditional understanding of the term, an individual "takes" a wild animal through knowing or intentional conduct. *See United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 489 (5th Cir. 2015) ("One does not reduce an animal to human control accidentally or by omission; he does so affirmatively.").

3

¶48    Thus, the act of "taking" with respect to wildlife has long been associated with purposeful activities like hunting, fishing, trapping, and the like.  Colorado's wildlife code reflects this traditional understanding.[2]  Prior to 1994, "take" and "hunt" were used interchangeably; the combined definition included exceptions for watching or photographing wildlife and for the accidental wounding or killing of wildlife by a car or train:

> *Take or hunt* means to pursue, shoot, wound, kill, trap, possess, capture, collect, attract, stalk, or lie in wait or to attempt any of the foregoing for the purpose of taking wildlife, whether or not such wildlife is then or subsequently taken, but such terms shall not include stalking, attracting, or searching for or lying in wait for wildlife by an unarmed person solely for the purpose of watching wildlife or taking pictures thereof or accidental wounding or killing by a motor vehicle, locomotive, or train.

§ 33-1-102(43), C.R.S. (1993) (emphasis added).

---

[2] Colorado's original 1899 Game and Fish Act largely concerned hunting- and fishing-related activities but did include a handful of provisions proscribing certain practices that we might today call industrial pollution.  For example, the Act provided that "[n]o sawdust, tailings or other deleterious or poisonous substance shall be allowed to run or pass into or pollute any public waters containing fish, or deposited or left where it may be carried by natural causes into such waters, in such quantities as to destroy or be detrimental to the fish or spawn therein."  Ch. 98, sec. 7, 1899 Colo. Sess. Laws 184, 213–14.  The General Assembly later removed such provisions, however, narrowing the scope of the wildlife code.  To the extent some current provisions still refer to "poisons" in part 2 of article 6, the legislative declaration in that part of the wildlife code makes clear that these provisions are not about curbing pollution but aim to "promote humane methods of animal control and discourage the use of inhumane methods" of controlling wildlife populations.  § 33-6-201(1)(b), C.R.S. (2020).

4

¶49 Amendments in 1994 split apart the definitions of "take" and "hunt" but the concepts remained linked. *See* ch. 269, sec. 1, § 33-1-102, 1994 Colo. Sess. Laws 1574, 1575–77. The separate, but broader, definition of "hunt" *includes* "take" and lists a variety of purposeful activities, all of which inherently require knowing conduct directed at wildlife. § 33-1-102(25.5), C.R.S. (2020) (defining "hunt" to mean "pursue, attract, stalk, lie in wait for, or attempt to shoot, wound, kill, trap, capture, collect, or *take* wildlife" (emphasis added)). This definition of "hunt" carried over and incorporated the earlier exception for the viewing or photographing of wildlife. *Id.*; 1994 Colo. Sess. Laws at 1575.

¶50 The narrower term "take," as amended by the 1994 amendments and at the time of the 2015 rainstorm event here, was more specifically defined as "*to acquire possession of* wildlife." § 33-1-102(43), C.R.S. (2015) (emphasis added).[3] This definition retained the pre-1994 general exception for the "accidental wounding or killing" of wildlife, expanding it to refer to accidents involving a "motor vehicle, *vessel,* or train." *Id.* (emphasis added); *see also* § 33-1-102(49) (defining "vessel" as

---

[3] This provision was amended in 2020 to clarify that "take" includes the killing of wildlife. *See* ch. 49, sec. 1, § 33-1-102(43), 2020 Colo. Sess. Laws 167, 167 (defining "take" as "to *kill or otherwise* acquire possession of wildlife" (emphasis added)). This amendment confirms, consistent with the long history of the wildlife code, that "hunt" and "take" require affirmative, knowing conduct.

5

"every description of watercraft used or capable of being used as a means of transportation of persons or property on water").

¶51    For purposes of the wildlife code, "possession" is defined as "either actual or constructive possession of or any control over the object referred to." § 33-1-102(34).  Notably, "possession" of wildlife is directly linked to hunting or related purposeful activities directed at wildlife.  Section 33-6-108, C.R.S. (2020), establishes that "the possession of wildlife shall be prima facie evidence that the person having such possession is engaged or has been engaged in hunting, fishing, or trapping."  Moreover, under the criminal code, "possession" can be a crime only if the defendant is "aware of his physical possession or control thereof for a sufficient period to have been able to terminate it."  § 18-1-501(9), C.R.S. (2020).  In other words, Colorado law does not criminalize *unknowing* possession.  *People v. Ceja*, 904 P.2d 1308, 1310 (Colo. 1995).

¶52    The statutory taking provisions are silent as to the requisite mens rea that the State must prove.  However, such "legislative silence does not always indicate a strict liability offense because the statute may imply a culpable mental state." *People v. Manzo*, 144 P.3d 551, 556 (Colo. 2006).  To the contrary, our legislature has made clear that "[a]lthough no culpable mental state is expressly designated in a statute defining an offense, *a culpable mental state may nevertheless be required for the commission of that offense*, or with respect to some or all of the material elements

6

thereof, *if the proscribed conduct necessarily involves such a culpable mental state.*"

§ 18-1-503(2), C.R.S. (2020) (emphases added).

¶53     Given the wildlife code's longstanding treatment of "take" as synonymous with hunting and related purposeful activities, the act of taking, by its very nature, "necessarily involves" knowing or intentional conduct.  *Id.*;[4] *cf. People v. Gordon*, 160 P.3d 284, 289 (Colo. App. 2007) (holding that section 33-6-117(1), C.R.S. (2020), requires that a defendant *knowingly* "take and abandon" wildlife).

¶54     This understanding of "take" is confirmed by a multitude of other provisions throughout articles 1 through 6 of Title 33.  Viewed as a whole, the wildlife code is replete with provisions joining the word "take" with "hunt" or similar, purposeful acts directed at wildlife, signaling that "take" likewise requires knowing or intentional conduct.  *See, e.g.*, § 33-6-120(1), C.R.S. (2020) (making it unlawful "to fish, trap, hunt, or take any wildlife outside of the season"); § 33-6-123, C.R.S. (2020) (making it unlawful to "hunt or take any wildlife" while under the influence of alcohol or a controlled substance); § 33-6-124(1)(a), C.R.S.

_____

[4] Notably, the taking provisions under the wildlife code are not passively phrased in terms of a particular result; they do not, for example, simply prohibit acts that "cause the death of" wildlife.  *Compare* § 18-3-105, C.R.S. (2020) (prohibiting criminally negligent conduct that "*causes the death* of another person"(emphasis added)).  Rather, these provisions forbid the specific act of "taking" wildlife.

7

(2020) (making it unlawful "to hunt, take, or harass wildlife from or with a motor vehicle"); § 33-6-124(2), C.R.S. (2020) (making it unlawful to spot or locate wildlife from an aircraft "to pursue, hunt, or take game"); § 33-6-117(1)(a)(I) (making it an offense "to hunt or take . . . wildlife and detach or remove, with the intent to abandon the carcass or body, only the head, hide, claw, teeth, antlers, horns, internal organs, or feathers of any or all of such parts"). And certain wildlife code offenses make sense only if "take" requires knowing conduct. Logically, persons must *know* they are "taking" wildlife when engaging in such activity unlawfully in excess of a bag limit, *see* § 33-1-102(1.5); out of season, *see* § 33-6-120(1); or without wearing proper fluorescent pink or orange safety garments, *see* § 33-6-121(1), C.R.S. (2020).

¶55 The State argues that "take" cannot require that conduct be knowing because if it did, there would be no need for the exception for the "accidental wounding or killing of wildlife" in section 33-1-102(43). I disagree. The wounding or killing of wildlife with a car, boat, or train can be knowing or intentional and yet still be "accidental" under the everyday meaning of that term. Anyone who has driven on a rural Colorado highway has likely faced an errant deer or other wildlife that has suddenly leapt onto the roadway. In such situations, a driver may understandably choose to strike the wildlife rather than veer into oncoming traffic or drive over a cliff. The same goes for an engineer of a train or the pilot of

8

a watercraft who is unable to safely stop or steer to avoid striking wildlife without causing injury to herself or other people. In such scenarios, the "taking" is knowing conduct—and yet the General Assembly has recognized that such takings are nonetheless "accidental" for which liability should not be imposed.

¶56 Similarly, I would decline to infer that the express limitation in section 33-2-104(3) and section 33-2-105(4) making it unlawful for a common carrier to "knowingly" transport wildlife reflects the legislature's determination that for all other persons, no culpable mental state is required at all. To the contrary, those provisions—which make it unlawful to "take, possess, transport, export, process, sell or offer for sale, or ship" wildlife—concern acts that, like hunting, fishing, and trapping, inherently require knowing conduct.

### III. The State Failed to Allege that 5 Star Acted Knowingly or Intentionally

¶57 The State's theory throughout this litigation has been that the discharge from 5 Star's wastewater containment ponds following the rainstorm migrated into the waterways and ultimately resulted in the death of fish. But as discussed above, the wildlife code is concerned with hunting, fishing, trapping, and related purposeful activities directed at wildlife; it does not purport to address industrial pollution or toxic torts. And even if it did, the State has not alleged that 5 Star constructed or maintained its wastewater containment ponds in violation of any statute or regulation. To be clear, the unfortunate events that led to the death of

9

wildlife here is surely a loss to Colorado. Certainly, the discharge of wastewater under these circumstances might even be deemed tortious under a different statutory scheme. But it is simply not the type of knowing or intentional conduct directed at wildlife that is contemplated by the taking statutes at issue here.

## IV. Conclusion

¶58 For the foregoing reasons, because the State failed to allege knowing or intentional conduct by 5 Star amounting to a "taking" of wildlife, its case cannot survive summary judgment. Although I arrive at my conclusion under different reasoning than the plurality, I nevertheless agree that the case should be remanded to the district court for entry of summary judgment in favor of 5 Star. Therefore, I respectfully concur in the judgment only.

10

JUSTICE HOOD, dissenting.

¶59 The plurality holds that the State failed to present evidence of a voluntary but prohibited act because 5 Star Feedlot, Inc.'s ("5 Star") "operation of wastewater containment ponds . . . didn't kill . . . fish." Plur. op. ¶ 34. Instead, the plurality attributes the deaths to the rain, which was "beyond [5 Star's] control." *Id.* at ¶ 37.

¶60 But the plurality's concern implicates causation, not voluntariness. When a crime prohibits a result—like causing fish to die—proving the actus reus requires evidence of a voluntary act that actually and proximately caused the forbidden result. So, the fact that 5 Star exerted conscious effort to store feces-contaminated water in ponds was sufficient if it actually and proximately caused the deaths.

¶61 The district court found that no genuine dispute existed over whether 5 Star's conduct was an actual cause of the deaths. Thus, 5 Star performed the actus reus of the take statutes if it was also foreseeable that the practice of storing wastewater in ponds would combine with a rainstorm to kill fish.

¶62 Because I would reverse on actus reus, I also address whether the division correctly held that the take statutes imply a mens rea of "knowingly." On this second issue, I would also reverse the division. The text of the take statutes reveals that the State was right to read them as imposing strict liability.

1

¶63　Accordingly, I would remand this case to the court of appeals to address 5 Star's unresolved causation arguments.

## I. Actus Reus

¶64　The plurality correctly defines "actus reus" as "[t]he wrongful deed that comprises the physical components of a crime," including "the social harm caused." *Id.* at ¶ 27 (emphasis omitted) (quoting *Actus Reus*, Black's Law Dictionary (11th ed. 2019)). I also agree that a crime's actus reus includes "[t]he minimum requirement" of "a voluntary act," *id.* at ¶ 25 (emphasis omitted) (quoting § 18-1-502, C.R.S. (2020)), which is "a bodily movement" "performed consciously as a result of effort," *id.* (quoting § 18-1-501(1), (9), C.R.S. (2020)).

¶65　Yet the plurality neglects to mention that, "[a]lthough a voluntary act is an absolute requirement for criminal liability, it does not follow that every act up to the moment that the harm is caused must be voluntary." 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.1(c) (3d ed. 2020); *accord State v. Burrell*, 609 A.2d 751, 753 (N.H. 1992) (holding there's "no support" for the rule that the prosecution must "prove that the defendant's *last* act was voluntary"). Take the example of a person subject to fainting spells who passes out while driving and kills a pedestrian. The driver's "voluntary act consists of driving the car," even though the bodily movements immediately before the crash were involuntary. LaFave, *supra*, § 6.1(c); *see State v. Newman*, 302 P.3d 435, 442 (Or. 2013) ("If the driver . . .

2

loses consciousness with the result that he runs over a pedestrian, . . . a *prior* voluntary act, such as the act of driving, . . . may . . . be regarded as sufficient[] . . . ." (emphasis added) (quoting Model Penal Code § 2.01 cmt. (Am. L. Inst., Tentative Draft No. 4 1955))).

¶66 The plurality accepts that storing feces-contaminated water in ponds was a voluntary act but dismisses the practice as irrelevant. Plur. op. ¶ 34. The take statutes prohibit voluntary acts that kill fish, and 5 Star's "operation of wastewater containment ponds," voluntary as it was, "didn't kill . . . fish." *Id.* Instead, the spill "was triggered by the rainstorm, which was certainly not . . . an act 5 Star undertook 'consciously as a result of effort or determination.'" *Id.* at ¶ 35 (quoting § 18-1-501(9)).

¶67 But, of course, storing the wastewater in manure ponds *did* kill fish. The district court found that rain alone wouldn't have been a problem. It was the toxic *combination* of feces and rainwater that wreaked havoc. Thus, the storm and the containment ponds were both necessary ingredients for the deaths of the fish. As such, each was a but-for or actual cause of the accidental killings. Without the storage of the wastewater in the containment ponds, the spill would not have occurred.

¶68 While the plurality's interest in the legal significance of the rain is understandable, it has conflated the voluntary act requirement with an entirely

3

different aspect of actus reus: causation.  Indeed, the plurality's argument that the voluntary act of storing wastewater in manure ponds didn't kill the fish boils down to the idea that this practice didn't *cause* the fish to die.

¶69     Causation is a part of a crime's actus reus whenever the General Assembly prohibits a specific result.  *See* 1 Paul H. Robinson, *Criminal Law Defenses* § 88 (2020) ("Every criminal code contains offenses defined to include a *result* element; implicit in such an element is a requirement that there be a causal connection between the actor's conduct and the required result.").  Without meaning to suggest any moral equivalence between what happened here and the killing of human beings, I note that a common example of a "result crime" is homicide: "caus[ing] the death of a person."  § 18-3-103(1), C.R.S. (2020).  Analogously, the take statutes prohibit killing wildlife, which means "to cause physical death."  *Kill*, Black's Law Dictionary (11th ed. 2019).[1]  For these and other result crimes, courts

---

[1] The plurality assumes without deciding that "taking" included killing wildlife at the time of the accident.  Plur. op. ¶ 22 n.8.  That assumption is correct.  Until recently, "take" meant "to acquire possession of wildlife; but such term shall not include the accidental wounding or killing of wildlife by a motor vehicle, vessel, or train."  § 33-1-102(43), C.R.S. (2019).  "Possession" means "either actual or constructive possession of or *any control* over the object referred to." § 33-1-102(34), C.R.S. (2020) (emphasis added).  One exercises some control over an animal by killing it.  Moreover, the exclusion of some killings implies that other killings are included.  Subsequent statutory history confirms that "taking" has always included killing.  *See* ch. 49, sec. 1, § 33-1-102(43), 2020 Colo. Sess. Laws

4

deploy two principles of causation to decide whether a defendant has done the act of "causing." LaFave, *supra*, § 6.4(a).

¶70 Those principles are actual and proximate cause: "It is required, for criminal liability, that the conduct of the defendant be both (1) the actual cause, and (2) the 'legal' cause (often called 'proximate' cause) of the result." *Id.* Conduct is an actual cause when "the result would not have happened in the absence of the conduct." *Id.* at § 6.4(b). And, "[i]n the criminal law, the gist of the concept [of proximate cause] is the not-so-complex principle that persons normally should be deemed responsible [only] for the natural and probable consequences of their acts." *People v. Rostad*, 669 P.2d 126, 128 (Colo. 1983).

¶71 So, when a defendant's conduct and an "intervening cause" combine to actually cause a forbidden result, the question becomes whether that result was "the natural and probable consequence" of the conduct, versus something that the defendant "could not foresee." *People v. Saavedra-Rodriguez*, 971 P.2d 223, 226 (Colo. 1998) (quoting 1 Ronald A. Anderson, *Wharton's Criminal Law and Procedure* § 200 (12th ed. 1957)); *see Newman*, 302 P.3d at 442 ("[A] defendant may be held criminally liable for a prior voluntary act if that act, through a course of related

---

167, 167 (amending the definition of "take" to "*to kill or otherwise* acquire possession of wildlife" (emphasis added)).

5

and foreseeable events, results in proscribed conduct."). If the result wasn't foreseeable, then there's no proximate causation and the State hasn't proven the actus reus of causing.[2]

¶72 As *Rostad* and *Saavedra-Rodriguez* demonstrate, the plurality shouldn't dismiss proximate cause as exclusive to tort law. *See* plur. op. ¶¶ 38–39 ("[T]ort principles can't be shoehorned into section 33-6-110(1) because that statutory provision doesn't authorize the State to recover by proving a civil negligence claim. Rather, . . . section 33-6-110(1) requires proof establishing a criminal offense pursuant to one of the taking statutory provisions."). Criminal law implicates proximate causation whenever the General Assembly criminalizes causing. *See People v. Stewart*, 55 P.3d 107, 120–21 (Colo. 2002) ("A [criminal] defendant is responsible for serious bodily injury to another if the injury is a natural and probable consequence of his misconduct."); *United States v. Apollo Energies, Inc.*, 611 F.3d 679, 690 (10th Cir. 2010) ("Central to all of the Supreme Court's cases on the due process constraints on criminal statutes is foreseeability — whether it is framed as a constitutional constraint on causation and mental state, or whether it is framed as a presumption in statutory construction." (citations omitted));

---

[2] Logistically, we have held that "an intervening cause defense is properly treated as an affirmative defense." *People v. Stewart*, 55 P.3d 107, 118 n.6 (Colo. 2002).

6

Marianne Wesson, *Mens Rea and the Colorado Criminal Code*, 52 U. Colo. L. Rev. 167, 169 (1981) ("In order to prove causation the prosecution must show that the defendant's conduct was the proximate cause of the prohibited result, and not merely the 'but-for' cause.").

¶73     Tying everything together, to prove the actus reus of the take statutes, the State needed to show that 5 Star performed a voluntary act that actually and foreseeably caused fish to die. No one disputes that 5 Star voluntarily stored feces-contaminated water in ponds. And the State presented evidence that this wastewater mixed with rainwater, spilled into a river, and then killed fish by spiking the river's ammonia levels and depleting its dissolved oxygen. The superseding event of the rain implicates proximate causation, not the voluntary act requirement. Thus, the plurality errs by holding that the State "failed to formally allege, never mind present proof," that 5 Star committed a voluntary act prohibited by the take statutes. Plur. op. ¶ 5.[3]

---

[3] The plurality implies that I'm "lawyer[ing]" for the State, injecting causation into the debate over actus reus where the State failed to. Plur. op. ¶ 39 n.15. Not so. Urging us to grant certiorari, the State argued that "5 Star confuses the voluntary act requirement with causation." And, at oral argument, the State told this court, "Operating wastewater ponds involves any number of voluntary acts. . . . They violate the take statutes when they proximately cause the take, when they foreseeably cause wildlife to die." But regardless of who thought of what, it is really the plurality that has put causation at issue with its claim that the voluntary

## II. Mens Rea

¶74 The plurality affirms the division on actus reus, so it doesn't reach the division's other holding that the State failed to present evidence that 5 Star violated the take statutes' implied mens rea of "knowingly." *See id.* at ¶ 6; *Dep't of Nat. Res. v. 5 Star Feedlot Inc.*, 2019 COA 162M, ¶ 25, __ P.3d __; *see also* § 18-1-501(6) ("A person acts 'knowingly' or 'willfully', with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result."). Given my resolution of the actus reus issue, I would decide this question and hold that the take statutes impose strict liability.

¶75 The State sued 5 Star pursuant to a statute that authorizes "a civil action against any person . . . to recover . . . value of any wildlife taken in violation of [the Wildlife Code]." § 33-6-110(1), C.R.S. (2020).[4] The State claimed violations of three predicate take statutes, and none of them specify a mens rea for taking:

---

act of storing feces-contaminated water in ponds didn't kill fish. There's no way to understand that assertion except as a rejection of the district court's factual finding that 5 Star's conduct actually caused the fish to die. I raise proximate causation to show that, even if the plurality believes that 5 Star's conduct was less important than the rain, there's no need to deny that 5 Star's conduct was a but-for cause of the fish's deaths. On remand, proximate causation would have provided a framework for analyzing whether 5 Star is legally blameworthy given the intervening cause of the rain.

[4] This civil case implicates fundamental principles of criminal law because other provisions in the Wildlife Code make it a misdemeanor to violate the take statutes.

- "*It is unlawful for any person to* hunt, *take*, or have in such person's possession any *wildlife [within this state and not privately owned]*, except as permitted by [the Wildlife Code] or by rule or regulation of the [Parks and Wildlife Commission (the "Commission")]." § 33-6-109(1), C.R.S. (2020) (emphases added).

- "*[I]t is unlawful for any person to take*, possess, transport, export, process, sell or offer for sale, or ship *nongame wildlife* deemed by the [C]ommission to be in need of management . . . . [I]t is also unlawful for any common or contract carrier to knowingly transport or receive for shipment nongame wildlife deemed by the [C]ommission to be in need of management . . . ." § 33-2-104(3), C.R.S. (2020) (emphases added).

- "*[I]t is unlawful for any person to take*, possess, transport, export, process, sell or offer for sale, or ship and for any common or contract carrier to knowingly transport or receive . . . species . . . of *wildlife . . . determined to be threatened* . . . [by the Commission]." § 33-2-105(4), C.R.S. (2020) (emphases added).

¶76 Although "[t]he legislature can proscribe an act without regard to a culpable mental state," *People v. Washburn*, 593 P.2d 962, 964 (Colo. 1979), "the requisite mental state may be implied," *People v. Gross*, 830 P.2d 933, 940 (Colo. 1992). Whether a statute implies a mental state requirement turns on "the plain and ordinary meaning of the statutory language" and "the legislative intent represented by the statutory scheme." *People v. Manzo*, 144 P.3d 551, 554 (Colo. 2006); *see also* § 18-1-503(2), C.R.S. (2020) ("[A] culpable mental state may . . . be

---

*See* § 33-6-109(3), C.R.S. (2020); § 33-6-104(1), C.R.S. (2018). "[W]e must interpret [a] statute consistently, whether we encounter its application in a criminal or noncriminal context . . . ." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).

9

required for the commission of [an] offense . . . if the proscribed conduct necessarily involves such a culpable mental state.").

¶77 At the time of the accident, the Wildlife Code defined "take" as "to acquire possession of wildlife; but such term shall not include the accidental wounding or killing of wildlife by a motor vehicle, vessel, or train." § 33-1-102(43), C.R.S. (2019). Since "[t]he presence of one exception is generally construed as excluding other exceptions," the exclusion of certain accidental killings reveals that "take" includes all other accidental killings. *Riley v. People*, 104 P.3d 218, 221 (Colo. 2004).

¶78 5 Star's response to the definition of "take" falls flat. It argues that the exception for some accidental killings is meant to "protect[] individuals from liability for acts knowingly directed toward wildlife after an accident," such as "dislodg[ing], mov[ing], aid[ing], or euthaniz[ing] an animal after an accident." But, by its own terms, the exception applies only to accidents and only to acts that kill or wound by means of a vehicle.[5]

---

[5] The concurrence reasons that the definition of "take" doesn't rule out a knowing mens rea because a driver could kill wildlife knowingly and accidentally. Conc. op. ¶ 55. "A person acts 'knowingly' . . . with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result." § 18-1-501(6). So, when a "practically certain" harm materializes, that's "no . . . 'accident'"; it is "the result of a deliberate decision to endanger another." *Voisine v. United States*, 136 S. Ct. 2272, 2278–79 (2016).

10

¶79    A second clue that the General Assembly didn't imply a mens rea for taking is the express inclusion of a knowledge standard in sections 33-2-104(3) and 33-2-105(4) for the transportation of wildlife by common carriers. The inclusion of that mental state requirement signals that the General Assembly meant what it said when it omitted a mens rea for taking in the same subsections.

¶80    5 Star responds that the legislature implied a knowing mens rea for the entire subsection but included the express language to appease common carriers. But we read statutes to "avoid[] rendering any words or phrases meaningless." *People v. Ross*, 2021 CO 9, ¶ 34, 479 P.3d 910, 917.

¶81    Further, by drawing the line at knowing conduct, 5 Star (and the concurrence) would read the Wildlife Code as allowing people to kill wildlife recklessly or with criminal negligence. *See* § 18-1-501(8) ("A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that a result will occur . . . ."); § 18-1-501(3) ("A person acts with criminal negligence when, through a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustifiable risk that a result will occur . . . ."). That result conflicts with "the policy of the state of Colorado that the wildlife and their environment are to be protected, preserved, enhanced, and managed for the use, benefit, and enjoyment of the people of this state and its visitors." § 33-1-101(1), C.R.S. (2020). To the extent a statute is ambiguous,

11

Colorado courts may consider "[t]he object sought to be attained," "[t]he consequences of a particular construction," and "[t]he legislative declaration or purpose." § 2-4-203(1)(a), (e), (g), C.R.S. (2020).

¶82 The division didn't analyze the aforementioned textual evidence of strict liability, *see 5 Star Feedlot*, ¶¶ 16–26; instead, it extended the reasoning of two decisions from the court of appeals. In one of those cases, a division held that there was an implied mens rea of knowing for a statute's prohibition against "kill[ing] and abandon[ing] any wildlife." *People v. Lawrence*, 55 P.3d 155, 163 (Colo. App. 2001) (quoting § 33-6-117, C.R.S. (2001)), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). The second case reached the same conclusion after the same statute was amended to prohibit "tak[ing] and abandon[ing]" wildlife. *People v. Gordon*, 160 P.3d 284, 289 (Colo. App. 2007) (quoting § 33-6-117, C.R.S. (2007)). Both divisions reasoned that the statute "logically require[d]" a knowing mental state. *Lawrence*, 55 P.3d at 163; *Gordon*, 160 P.3d at 289.

¶83 The division below thought that the take statutes at issue here also logically require a knowing mental state since they "proscribe[] conduct that is virtually identical to the conduct proscribed by the versions of [the statute] construed in those cases." *5 Star Feedlot*, ¶ 23. The division also conducted a *noscitur a sociis* analysis, concluding that "take" requires a mental state of knowingly because it appears in series with other conduct that implies knowledge: "hunt, take, or have

12

in such person's possession." *Id.* at ¶¶ 23–24 (quoting § 33-6-109(1)). Neither argument overpowers the textual evidence of strict liability.

¶84 The two court of appeals cases interpreted a statute entitled "Willful destruction of wildlife—legislative intent." § 33-6-117, C.R.S. (2020). Since "willfully" and "knowingly" are synonyms, § 18-1-501(6), it made sense for the divisions to infer a knowledge requirement. Further, the divisions interpreted the phrases "kill[ing] and abandon[ing]" and "tak[ing] and abandon[ing]." Since "abandon" means "[t]o relinquish or give up with the *intention* of never again reclaiming one's rights or interest in," *Abandon*, Black's Law Dictionary (11th ed. 2019) (emphasis added), it was reasonable to require the general intent mental state of knowledge, *see* § 18-1-501(6). But, since the titles of the take statutes in this case don't imply a mental state requirement and the statutes don't pair taking with abandoning, a knowing mental state isn't logically required here.

¶85 The division's *noscitur a sociis* argument doesn't work either. Sections 33-2-104(3) and 33-2-105(4) make it unlawful to "take, possess, transport, export, process, sell or offer for sale, or ship" wildlife. It is particularly easy to imagine the unknowing transportation of wildlife. Presumably, that's why the General Assembly expressly imposed a mens rea of knowledge for transportation by common carriers.

13

¶86    Further, the *noscitur a sociis* analysis doesn't even make sense for section 33-6-109(1) because, at least under the Wildlife Code, one can "have . . . possession" of wildlife unknowingly. *See* § 33-1-102(34) (defining "possession" to include "any control over the object"). Surprisingly, the division's primary support for its rule that possession requires knowledge is the definition of "voluntary act": "an act performed consciously as a result of effort or determination, and includes the possession of property if the actor was aware of his physical possession or control thereof for a sufficient period to have been able to terminate it." § 18-1-501(9); *see 5 Star Feedlot*, ¶ 23. But the fact that mere possession qualifies as a voluntary act only if a defendant had awareness doesn't establish a universal mens rea for possession crimes.

¶87    Having reviewed the take statutes, I would hold that they do not contain an implied mens rea requirement, let alone a mens rea of knowledge.

### III.  Conclusion

¶88    Because I would reverse the division on actus reus and mens rea, I would remand this case to the court of appeals for the resolution of 5 Star's causation arguments. One of those arguments is that the district court should have granted 5 Star's motion for summary judgment because the State's causation evidence was insufficient. That issue includes whether 5 Star foreseeably caused the fish to die.

14

I am authorized to state that **JUSTICE HART** and **JUSTICE BERKENKOTTER** join in this dissent.